**No. 25-12365**

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

MEUDY ALBÁN OSIO, in her personal capacity and in her capacity as the personal representative of the Estate of Fernando Alberto Albán, FERNANDO ALBÁN OSIO, MARIA FERNANDA ALBÁN OSIO,

*Plaintiffs-Appellees*,

v.

NICOLÁS MADURO MOROS, *et al.*,

*Defendants*,

v.

PETRÓLEOS DE VENEZUELA, S.A. (PDVSA)

*Respondent-Appellant*.

Appeal from an Order of the United States District Court
for the Southern District of Florida, Case No. 1:21-CV-20706

# APPELLEES' RESPONSE BRIEF

Jaime D. Guttman
Scale Law Partners, LLC
777 Brickell Avenue, Ste. 500
Miami, FL 33131
jaime@scale.law
(786) 273-9033

Charles A. Rothfeld
Alex C. Lakatos
Natasha K. Harnwell-Davis
MAYER BROWN LLP
1999 K Street, N.W.
Washington, D.C. 20006
CRothfeld@mayerbrown.com
(202) 263-3000

*Counsel for Plaintiffs-Appellees Meudy Albán Osio, et al.*

## AMENDED CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1, 26.1-2, and 26.1-3, Appellees Meudy Albán Osio, et al. certify the following individuals and entities have an actual or potential interest in the outcome of the appeal:

1. Albán Osio, Fernando (Plaintiff)
2. Albán Osio, Maria Fernanda (Plaintiff)
3. Albán Osio, Meudy (Plaintiff)
4. Anderson, Cloe M. (Counsel for Plaintiffs)
5. Anschtz Gmbh (Claimant)
6. Ara, Diego Perez (Counsel for Garnishee ENI Trading & Shipping, Inc.)
7. Baker & McKenzie, LLP (Counsel for Garnishee Shell Trading (US) Company and Claimant Anschtz Gmbh)
8. Baker Botts, LLP (Counsel for Garnishees Repsol E&P Capital Markets US,
9. Baker Hostetler, LLP (Counsel for Garnishee Weatherford International, LLC)

10. Bariven, S.A. (Subsidiary of Respondent-Appellant Petróleos de Venezuela, S.A.)

11. Bernstein, Benedict S. (District Court Counsel for Petróleos de Venezuela, S.A.)

12. Bianchi, Jamie A. (District Court Counsel for Petróleos de Venezuela, S.A.), (Counsel for Respondent Banco Bicentenario del Pueblo, de la Clase Obrera, Mujer, y Comunas, Banco Universal, C.A.)

13. Blank Rome, LLP (Counsel for Garnishee Pierce Manufacturing, Inc.)

14. Blasi, Fernando (Member of the Counsel for the Administration and Protection of the Assets of the Republic of Venezuela (Consejo de Administración y Protección de Activos de la República de Venezuela)

15. Brackett, Alex J. (Counsel for Garnishee Vitol Inc.)

16. Braverman Greenspun, P.C. (Counsel for Garnishee JP Morgan Chase Bank, N.A.)

17. Caballero, Antonio (Third Party Defendant)

18. Cárdenas, Julián (Member of the Ad Hoc Administrative Board of Petróleos de Venezuela, S.A.)

19. Cartel of the Suns (Defendant)

20. Citibank, N.A. (Garnishee)

21. Citigroup Inc. (C) (Parent of Garnishee Citibank, N.A.)

22. Coffey, Melissa B. (Counsel for Garnishees Global Financial Management Services; Global Oil Delivery Systems, LLC; Global Oil Financial Services, LLC; and Global Oil Terminals, LLC)

23. Cooper, Brenton Hayes (Counsel for Garnishees Repsol E&P Capital Markets US, LLC; Repsol E&P USA Holdings; Repsol Energy North America-Canada Partnership; Repsol Offshore E&P USA, Inc.; Repsol Oil & Gas USA, LLC; Repsol Trading USA, LLC; Repsol USA Holdings, LLC; and Halliburton Company)

24. Council for the Management and Protection of Assets of the Republic of Venezuela (Consejo de Administración y Protección de Activos de la República de Venezuela) ("CAPA")

25. Crow, Heather Folsom (Counsel for Garnishees Schlumberger Limited and Schlumberger Technology Corporation)

26. Davis, Benjamin Cody (Counsel for Claimant Anschtz Gmbh)

27. DeLelle, Claire (Appellate Counsel for Respondent-Appellant Petróleos de Venezuela, S.A.) (Counsel for Respondent Banco

Bicentenario del Pueblo, de la Clase Obrera, Mujer, y Comunas, Banco Universal, C.A.)

28. Eni Petroleum Co. Inc. (Garnishee)

29. Eni S.p.A. (E) (Parent of Garnishees Eni Petroleum Co. Inc.; Eni Oil & Gas Inc.; Eni Trading & Shipping, Inc.; and Versalis Americas Inc.)

30. Eni Trading & Shipping, Inc. (Garnishee)

31. Esposito, Michael Roy (Counsel for Garnishee Pierce Manufacturing Inc.)

32. Fay, W. Dylan (Appellate Counsel for Respondent-Appellant Petróleos de Venezuela, S.A.) (Counsel for Respondent Banco Bicentenario del Pueblo, de la Clase Obrera, Mujer, y Comunas, Banco Universal, C.A.)

33. Feigenbaum, Steven B. (Counsel for Garnishee JP Morgan Chase Bank, N.A.)

34. Floch, Brandon Scott (Counsel for Garnishees Valero Energy Corporation and Valero Marketing and Supply Company)

35. Foley & Lardner LLP (Counsel for Garnishees Global Financial Management Services; Global Oil Delivery Systems, LLC; Global Oil Financial Services, LLC; and Global Oil Terminals, LLC)

36. Fuerzas Armada Revolucionarias De Columbia (Defendant)

37. Gayles, the Honorable Darrin P. (United States District Court Judge)

38. Global Financial Management Services (Garnishee)

39. Global Oil Delivery Systems, LLC (Garnishee)

40. Global Oil Financial Services, LLC (Garnishee)

41. Global Oil Terminals, LLC (Garnishee)

42. Goicoechea, Yon (Member of CAPA)

43. Gonsalves, Marc (Third Party Defendant/Claimant)

44. Greenberg Traurig (Counsel for Garnishee JP Morgan Chase Bank, N.A.)

45. Guttman, Jamie D. (Counsel for Plaintiffs)

46. Halliburton Company (HAL) (Garnishee)

47. Harnwell-Davis, Natasha (Counsel for Plaintiffs-Appellees)

48. Holladay, Sara F. (Counsel for Garnishee Vitol Inc.)

49. Houston Refining LP (Garnishee)

50. Howes, Thomas (Third Party Defendant/Claimant)

51. Janis, Christopher (Third Party Defendant/Claimant)

52. Janis, Jonathan (Third Party Defendant/Claimant)

53. Janis, Judith (Third Party Defendant/Claimant)

54. Janis, Michael (Third Party Defendant/Claimant)

55. **Jimenez, Marcos Daniel (Counsel for Respondent Banco Bicentenario del Pueblo, de la Clase Obrera, Mujer, y Comunas, Banco Universal, C.A.)**

56. JP Morgan Chase & Co. (JPM) (Parent of Garnishee JP Morgan Chase Bank, N.A.)

57. JP Morgan Chase Bank, N.A. (Garnishee)

58. Klein, Jonathan Samuel (Former Counsel for Plaintiffs)

59. Korvick, Tony P. (Counsel for Third Party Defendants/Claimants)

60. Laing, Kufere J. (Appellate Counsel for Respondent-Appellant Petróleos de Venezuela, S.A.)

61. Lakatos, Alex C. (Counsel for Plaintiffs)

62. Lara, Iván (Member of the Ad Hoc Administrative Board of Petróleos de Venezuela, S.A.)

63. Lash & Goldberg, LLP (Counsel for Garnishees Houston Refining LP; Lyondell Chemical Company; and Lyonell Refining Company, LLC)

64. LDC Supply International, LLC (Garnishee)

65. Leon Cosgrove, LLC (Counsel for Garnishee ENI Trading & Shipping, Inc.)

66. Leon, Derek Eduardo (Counsel for Garnishee ENI Trading & Shipping, Inc.)

67. Lerner, Joshua D. (Counsel for Garnishee StoneX Group, Inc.)

68. Lisko, David John (Counsel for Garnishee Citibank, N.A.)

69. LLC; Repsol E&P USA Holdings; Repsol Energy North America-Canada Partnership; Repsol Offshore E&P USA, Inc.; Repsol Oil & Gas USA, LLC; Repsol Trading USA, LLC; Repsol USA Holdings, LLC; and Halliburton Company)

70. Lyondell Chemical Company (Garnishee)

71. Lyondell Refining Company, LLC (Garnishee)

72. LyondellBasell Indus. N.V. (LYB) (Parent of Garnishees Houston Refining LP; Lyondell Chemical Company; and Lyondell Refining Company, LLC)

73. M&T Bank Corporation (MTB) (Garnishee)

74. Maduro Moros, Nicolas (Defendant)

75. **Mahaffey, Michael (Counsel for Respondent Banco Bicentenario del Pueblo, de la Clase Obrera, Mujer, y Comunas, Banco Universal, C.A.)**

76. **Manzo, Sofia (Counsel for Respondent Banco Bicentenario del Pueblo, de la Clase Obrera, Mujer, y Comunas, Banco Universal, C.A.)**

77. Marcano, Gustavo (Coordinator of CAPA)

78. Marcus Neiman, Rashbaum, & Pineiro LLP (Counsel for Garnishees Valero Energy Corporation and Valero Marketing and Supply Company)

79. Mark Pollack Law PA (Counsel for Defendant Sunstate Bank)

80. Mayer Brown, LLP (Counsel for Plaintiffs)

81. McGuire Woods, LLP (Counsel for Garnishee Vitol Inc.)

82. Medina, Horacio (Chairman of the Ad Hoc Administrative Board of Petróleos de Venezuela, S.A.)

83. Medlock, Stephen M. (Counsel for Plaintiffs)

84. Millan, Carlos (Member of CAPA)

85. Moreno Perez, Maikel Jose (Defendant)

86. Neiman, Jeffrey Adam (Counsel for Garnishees Valero Energy Corporation and Valero Marketing and Supply Company)

87. Oshkosh Corporation (OSK) (Parent of Garnishee Pierce Manufacturing Inc.)

88. Padrino Lopez, Vladimir (Defendant)

89. Parrish, Jimmy D. (Counsel for Garnishee Weatherford International, LLC)

90. **Patricios, Leon Nicholas (Counsel for Antonio Caballero)**

91. PBF Energy Inc. (PBF) (Garnishee)

92. Pescatore, Jada (Third Party Defendant/Claimant)

93. Pescatore, Jarrod (Third Party Defendant/Claimant)

94. Pescatore, John (Third Party Defendant/Claimant)

95. Pescatore, Jordan (Third Party Defendant/Claimant)

96. Pescatore, Josh (Third Party Defendant/Claimant)

97. Pescatore, Olivia (Third Party Defendant/Claimant)

98. Pescatore, Richard (Third Party Defendant/Claimant)

99. Petrocedeño, S.A. (Subsidiary of Respondent-Appellant Petróleos de Venezuela, S.A)

100. Petróleos de Venezuela, S.A. (Respondent-Appellant)

101. Petroleum Marketing International (Subsidiary of Respondent-Appellant Petróleos de Venezuela, S.A.)

102. Petromonagas, S.A. (Subsidiary of Respondent-Appellant Petróleos de Venezuela, S.A.)

103. Petropiar, S.A. (Subsidiary of Respondent-Appellant Petróleos de Venezuela, S.A.)

104. Pierce Manufacturing Inc. (Garnishee)

105. Pineiro, Michael Anthony (Counsel for Garnishees Valero Energy Corporation and Valero Marketing and Supply Company)

106. PNC Bank, N.A. (PNC) (Garnishee)

107. Pollack, Mark Elliot (Counsel for Defendant Sunstate Bank)

108. Porter & Korvick, P.A. (Counsel for Third Party Defendants/Claimants)

109. Porter, Newton Patrick (Counsel for Third Party Defendants/Claimants)

110. Prada, Ricardo (Member of the Ad Hoc Administrative Board of Petróleos de Venezuela, S.A.)

111. Pruitt & Pruitt, P.A. (Counsel for Garnishee PNC Bank, N.A.)

112. Pruitt, William Earnest (Counsel for Garnishee PNC Bank, N.A.)

113. Repsol E&P Capital Markets US, LLC (Garnishee)

114. Repsol E&P USA Holdings (Garnishee)

115. Repsol Energy North America-Canada Partnership (Garnishee)

116. Repsol Offshore E&P USA, Inc. (Garnishee)

117. Repsol Oil & Gas USA, LLC (Garnishee)

118. Repsol Trading USA, LLC (Garnishee)

119. Repsol USA Holdings, LLC (Garnishee)

120. Reverol Torres, Nestor Luis (Defendant)

121. Riccio, L. Andrew Stern (Counsel for Garnishee Shell Trading (US) Company)

122. Rosneft Trading, S.A. (Garnishee)

123. **Rothfeld, Charles (Counsel for Plaintiffs-Appellees)**

124. Rumberger Kirk & Caldwell (Counsel for Garnishee StoneX Group, Inc.)

125. Saab, Tarek William (Defendant)

126. Salky, Mark Allan (Counsel for Garnishee JP Morgan Chase Bank, N.A.)

127. Scale Law Partners, LLC (Counsel for Plaintiffs)

128. Schlumberger Limited (SLB) (Garnishee)

129. Schlumberger Technology Corporation (Garnishee)

130. Shehadeh Giannamore, PLLC (Counsel for Defendant U.S. Century Bank)

131. Shehadeh, Jalal (Counsel for Defendant U.S. Century Bank)

132. Shell plc (SHEL) (Parent of Garnishee Shell Trading (US) Company)

133. Shell Trading (US) Company (Garnishee)

134. **Stallings, Stephen Sean (Counsel for Respondent Banco Bicentenario del Pueblo, de la Clase Obrera, Mujer, y Comunas, Banco Universal, C.A.)**

135. Stansell, Keith (Third Party Defendant/Claimant)

136. StoneX Group, Inc. (SNEX) (Garnishee)

137. Strauch, Michael Edward (Counsel for Garnishees Houston Refining LP; Lyondell Chemical Company; and Lyonell Refining Company, LLC)

138. Sunstate Bank (Defendant)

139. Tarin, Danielle (Appellate Counsel for Respondent-Appellant Petróleos de Venezuela, S.A.) (Counsel for Respondent Banco

Bicentenario del Pueblo, de la Clase Obrera, Mujer, y Comunas, Banco Universal, C.A.)

140. The Kullman Firm (Counsel for Garnishees Schlumberger Limited and Schlumberger Technology Corporation)

141. Torres, the Honorable Edwin G. (United States Magistrate Judge)

142. Trahan, Blair E. (District Court Counsel for Petróleos de Venezuela, S.A.)

143. U.S. Century Bank (Defendant)

144. USCB Financial Holdings, Inc. (USCB) (Parent of Defendant U.S. Century Bank)

145. Valero Energy Corporation (VLO) (Garnishee)

146. Valero Marketing and Supply Company (Garnishee)

147. Versalis Americas Inc. (Garnishee)

148. Vitol Inc. (Garnishee)

149. Weatherford International, LLC (WFRD) (Garnishee)

150. White & Case LLP (Appellate Counsel Law Firm for Respondent-Appellant Petróleos de Venezuela, S.A.)

151. White, Eric (Counsel for Plaintiffs-Appellees)

152. Zumpano Patricios & Winker (Counsel for Third Party Defendants/Claimants)

153. Zumpano, Joseph Ignacio (Counsel for Third Party Defendants/Claimants)

/s/ *Charles A. Rothfeld*
Charles A. Rothfeld

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-Appellees respectfully request oral argument pursuant to Federal Rule of Appellate Procedure 31(a)(2) and Eleventh Circuit Rule 28-1(c). This appeal presents important questions about the relationship between the Foreign Sovereign Immunities Act, as amended, 28 U.S.C. §§ 1330, 1441(d), 1602-1611, and the Terrorism Risk Insurance Act of 2002, 28 U.S.C. § 1610 note. Oral argument could be of assistance to the Court.

## TABLE OF CONTENTS

Page


INTRODUCTION ... 1

STATEMENT OF JURISDICTION ... 4

STATEMENT OF THE ISSUES ... 5

STATEMENT OF THE CASE ... 5

- I. Legal Framework ... 5
- II. Factual Background ... 8
  - A. Maduro And PDVSA ... 8
  - B. The United States Blocked Assets Belonging To Maduro And PDVSA. ... 9
  - C. Maduro And His Co-Defendants Murdered Fernando Alberto Albán. ... 12
- III. Procedural Background ... 13
  - A. The Albán Family Obtained Writs To Satisfy A $217 Million Judgment Against Maduro And His Co-Defendants. ... 13
  - B. PDVSA Sought To Vacate The Writs. ... 15

SUMMARY OF ARGUMENT ... 21

ARGUMENT ... 23

- I. Standard of Review ... 23
- II. The Courts Have Jurisdiction To Resolve The Claims Against PDVSA. ... 23
  - A. TRIA Abrogates PDVSA's Immunity. ... 25
    - 1. TRIA's text establishes liability here. ... 25
    - 2. Congress meant TRIA to establish a comprehensive mechanism for recovery. ... 30
    - 3. PDVSA's arguments in support of sovereign immunity are wrong. ... 33

B. The Political Question Doctrine Has No Application Here. 41

C. Alternatively, The District Court Had Jurisdiction Under The FSIA Commercial-Activities Exception. 45

III. PDVSA's Service-of-Process Arguments Lack Merit. 50

A. This Court Lacks Jurisdiction Over The Service-Of-Process Argument. 50

B. PDVSA's Service-of-Process Argument Is Meritless. 53

CONCLUSION 63

CERTIFICATE OF COMPLIANCE 64

CERTIFICATE OF SERVICE 65

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Adler v. Fed. Rep. of Nigeria*,
219 F.3d 869 (9th Cir. 2000) .... 47

*Atl. Enters., Inc. v. Nat'l Equip. Rental, Ltd.*,
208 F. Supp. 710 (D.P.R. 1962) .... 60

*Bank Markazi v. Peterson*,
578 U.S. 212 (2016) .... 27, 38, 39

*Buchanan v. Bowman*,
820 F.2d 359 (11th Cir. 1987) .... 8

*Caballero v. Fuerzas Armadas Revolucionarias de Colombia*,
2021 WL 1884110 (W.D.N.Y. May 11, 2021) .... 10, 11

*Casares v. Altman Specialty Plants, LLC*,
2023 WL 6162328 (D.N.M. Sep. 21, 2023) .... 59

*Cisneros v. Alpine Ridge Grp.*,
508 U.S. 10 (1993) .... 27

*Clancy v. Balacier*,
27 F. Supp. 867 (S.D.N.Y. 1939) .... 60

*Clarendon Am. Ins. Co. v. Krishna Assocs. of Titusville, Inc.*,
2006 WL 3762076 (M.D. Fla. Dec. 20, 2006) .... 59

*Corrado v. N.Y. Unified Ct. Sys.*,
163 F. Supp. 3d 1 (E.D.N.Y. 2016) .... 62

*Del Valle v. Trivago GMBH*,
56 F. 4th 1265 (11th Cir. 2022) .... 61

*Devengoechea v. Bolivarian Rep. of Venezuela*,
889 F.3d 1213 (11th Cir. 2018) .... 47

*Does 1-7 v. Taliban*,
101 4th 1 (D.C. Cir. 2024) .... 33, 39, 40, 41

**TABLE OF AUTHORITIES**
**(continued)**

**Cases (continued)** **Pages(s)**

*Harris Corp. v. Nat'l Iranian Radio & Television*,
691 F.2d 1344 (11th Cir. 1982) ........ 19, 54, 55, 58

*Havlish v. Taliban*,
152 F.4th 339 (2d Cir. 2025) ........ 2, 24, 27, 28, 30, 32, 41, 42

*Jefferson v. Delgado Cmty. Coll. Charity Sch. of Nursing*,
602 F. App'x 595 (5th Cir. 2015) ........ 52

*Jerez v. Rep. of Cuba*,
777 F. Supp. 2d 6 (D.D.C. 2011) ........ 36

*Lamar, Archer & Cofrin LLP v. Appling*,
584 U.S. 709 (2018) ........ 60

*Lauro Lines s.r.l. v. Chasser*,
490 U.S. 495 (1989) ........ 51

*Magelssen v. Hale*,
81 F. Supp. 138 (W.D. Mo. 1948) ........ 60

*Magness v. Russian Fed'n*,
247 F.3d 609 (5th Cir. 2001) ........ 55

*Miccosukee Tribe of Indians of Fla. v. U.S. Army Corps of Eng'rs*,
619 F.3d 1289 (11th Cir. 2010) ........ 27

*Miller v. Collectron Corp.*,
1999 WL 730981 (E.D.N.Y. Sep. 16, 1999) ........ 59

*Ministry of Def. & Support for the Armed Forces of the Islamic Rep. of Iran v. Elahi*,
556 U.S. 366 (2009) ........ 38

*Nixon v. Fitzgerald*,
457 U.S. 731 (1982) ........ 52

**TABLE OF AUTHORITIES**
**(continued)**

**Cases (continued)** **Pages(s)**

*North Dakota v. United States*,
460 U.S. 300 (1983) .......... 28

*OI Eur. Grp. B.V. v. Bolivarian Rep. of Venezuela*,
73 F.4th 157 (3d Cir. 2023) .......... 10, 11

*OI Eur. Grp. B.V. v. Bolivarian Rep. of Venezuela*,
663 F. Supp. 3d 406 (D. Del. 2023) .......... 12

*PDVSA US Litig. Tr. v. LukOil Pan Ams. LLC*,
65 F.4th 556 (11th Cir. 2023) .......... 9, 11, 44

*Peacock v. Thomas*,
516 U.S. 349 (1996) .......... 36, 37

*Prewitt Enters., Inc. v. OPEC*,
353 F.3d 916 (11th Cir. 2003) .......... 57

*Rep. of Argentina v. Weltover, Inc.*,
504 U.S. 607 (1992) .......... 47

*Rep. of Sudan v. Harrison*,
587 U.S. 1 (2019) .......... 56, 57

*Richardson-Merrell, Inc. v. Koller*,
472 U.S. 424 (1985) .......... 51

*Rodriguez v. Pan Am. Health Org.*,
29 F.4th 706 (D.C. Cir. 2022) .......... 47

*Rubin v. Islamic Rep. of Iran*,
709 F.3d 49 (1st Cir. 2013) .......... 39

*S & Davis Int'l, Inc. v. Rep. of Yemen*,
218 F.3d 1292 (11th Cir. 2000) .......... 4, 52, 53

**TABLE OF AUTHORITIES**
**(continued)**


**Cases (continued)** **Pages(s)**

*SEC v. Am. Land Co.*,
1987 WL 19930 (D.D.C. Nov. 6, 1987) ........ 59

*SEC v. MCC Int'l Corp.*,
2024 WL 180636 (11th Cir. Jan. 17, 2024) ........ 52

*Smith ex rel. Estate of Smith v. Fed. Reserve Bank of N.Y.*,
346 F.3d 264 (2d Cir. 2003) ........ 31

*Southway v. Cent. Bank of Nigeria*,
198 F.3d 1210 (10th Cir. 1999) ........ 47

*Stansell v. Revolutionary Armed Forces of Colombia*,
771 F.3d 713 (11th Cir. 2014) ("*Stansell II*") ........ 6, 7, 14, 20, 26
31, 37, 38, 43, 45

*Stansell v. Revolutionary Armed Forces of Colombia*,
45 F.4th 1340 (11th Cir. 2022) ("*Stansell V*") ........ 27, 37, 43, 45

*Tucker v. Faith Bible Chapel Int'l*,
36 F.4th 1021 (10th Cir. 2022) ........ 52

*Turkiye Halk Bankasi A.S. v. United States*,
598 U.S. 264 (2023) ........ 5, 46

*United States v. All Funds on Deposit with R.J. O'Brien & Assocs.*,
783 F.3d 607 (7th Cir. 2015) ........ 26, 28

*United States v. Grimon*,
923 F.3d 1302 (11th Cir. 2019) ........ 23

*United States v. Holy Land Found. for Relief & Dev.*,
445 F.3d 771 (5th Cir. 2006) ........ 39

**TABLE OF AUTHORITIES**
**(continued)**


**Cases (continued)** **Pages(s)**

*United States v. Sinovel Wind Grp. Co.*,
794 F.3d 787 (7th Cir. 2015) ........................................ 52

*United States v. Turkiye Halk Bankasi A.S.*,
16 F.4th 336 (2d Cir. 2021) ........................................ 47, 49

*Van Cauwenberghe v. Biard*,
486 U.S. 517 (1988) ........................................ 50

*Velidor v. L/P/G Benghazi*,
653 F.2d 812 (3d Cir. 1981) ........................................ 55

*Waldman v. Conway*,
871 F.3d 1283 (11th Cir. 2017) ........................................ 23, 45

*Weininger v. Castro*,
462 F. Supp. 2d 457 (S.D.N.Y. 2006) ........................................ 33

*Weinstein v. Islamic Rep. of Iran*,
609 F.3d 43 (2d Cir. 2010) ........................................ 28, 30, 31

**Statutes, Regulations and Rules**

8 U.S.C. § 1182(a)(3)(B)(iii) ........................................ 36

22 U.S.C. § 288a(b) ........................................ 39

28 U.S.C. § 566 ........................................ 13, 14

28 U.S.C. § 1291 ........................................ 4

28 U.S.C. § 1330. ........................................ 5

28 U.S.C. § 1331 ........................................ 4

Foreign Sovereign Immunities Act of 1976 (codified as
amended at scattered sections of 28 U.S.C.) ........................................ 2

**TABLE OF AUTHORITIES**
**(continued)**

**Statutes, Regulations and Rules (continued)** **Pages(s)**


28 U.S.C. § 1330 .......... 5

28 U.S.C. § 1602 .......... 5

28 U.S.C. § 1603(a) .......... 46

28 U.S.C. § 1603(b) .......... 42

28 U.S.C. § 1603(d) .......... 6, 46

28 U.S.C. § 1605(a)(2) .......... 46

28 U.S.C. § 1605(a)(7) .......... 6, 36

28 U.S.C. § 1605A .......... 6, 34, 35, 36

28 U.S.C. § 1605B .......... 6

28 U.S.C. § 1608(a)(3) .......... 56, 57

28 U.S.C. § 1608(b) .......... 16

28 U.S.C. § 1608(b)(2) .......... 56, 57, 59, 60, 61

Terrorism Risk Insurance Act of 2002, Pub. L. No. 107–297, § 201, 116 Stat. 2322, 2337 (codified as amended at 28 U.S.C. 1610 note) .......... 6, 24, 25, 26, 29, 30, 31, 32, 37, 38

50 U.S.C. § 1701 .......... 7

84 Fed. Reg. 3282 .......... 10

84 Fed. Reg. 38843 .......... 11

Fed. R. Civ. P. 4 .......... 14, 57, 59

Fed. R. Civ. P. 69(a)(1) .......... 14

Fla. Stat. § 48.181 .......... 59, 60, 61

**TABLE OF AUTHORITIES**
**(continued)**

**Statutes, Regulations and Rules (continued)** **Pages(s)**

Fla. Stat. § 56.21 .......... 14

Fla. Stat. § 56.031 .......... 13

Fla. Stat. § 56.061 .......... 13

**Other Authorities** **Pages(s)**

147 Cong. Rec. H8572-04 .......... 29

148 Cong. Rec. H6133-05 .......... 32

148 Cong. Rec. H6135-07 .......... 32

148 Cong. Rec. H6134 .......... 32

148 Cong. Rec. S5664-01 .......... 29

Bob Egelko, *9/11 Families Sue Saudis, Sudan for $3 Trillion – Defendants Accused of Funding al Qaeda*, San Francisco Chron. (Aug. 16, 2002), https://perma.cc/QT4J-JGL5 .......... 43

H.R. Conf. Rep. No. 94-1487 (1976) .......... 55

H.R. Conf. Rep. No. 107-300 (2001) .......... 29

H.R. Conf. Rep. No. 107-779 (2002) .......... 31

*Venezuelan Opposition Strips Juan Guaidó of 'Presidential' Role*, Associated Press (Dec. 30, 2022), https://perma.cc/3ZZT-Y5WJ .......... 10

# INTRODUCTION

This case arises out of an act of terrorism. The victim, Fernando Alberto Albán, was a campaigner for democracy in Venezuela. He was brutally tortured and murdered by defendant Nicolás Maduro Moros, the self-proclaimed President of Venezuela, and Maduro's associates (collectively, the "Maduro regime"). Albán's widow, Meudy Albán Osio, and his two children, Maria Fernanda Albán Osio and Fernando Albán Osio (collectively, "the Albáns" or "Albán family"), brought this suit in Florida against Maduro and his associates for their crime, obtaining a substantial default judgment. The Albáns then sought to enforce the judgment by attaching assets held by Petroleos de Venezuela, S.A. ("PDVSA"), Venezuela's state oil company, which the U.S. government repeatedly has described as the "primary conduit for corruption" by Maduro.

The Albáns' enforcement claim proceeded under the Terrorism Risk Insurance Act of 2002 ("TRIA"), which provides that a plaintiff who has obtained a judgment based on an act of terrorism may enforce that judgment by attaching or executing against blocked assets held by an "agency or instrumentality" of the terrorist party. In proceedings below, the district court held that TRIA overcomes PDVSA's sovereign immunity,

although the court remanded the case to a magistrate judge to make factual determinations about whether PDVSA actually is an agency or instrumentality of the Maduro regime and whether it received sufficient notice of the proceedings. PDVSA now challenges that decision on interlocutory appeal, maintaining that (1) TRIA does not overcome the sovereign immunity conferred upon state agencies by the Foreign Sovereign Immunities Act of 1976 (FSIA); (2) the political question doctrine precludes a court from determining whether PDVSA is an agency/instrumentality of the Maduro regime; and (3) PDVSA was not properly served.

PDVSA is wrong on each of these points.

*First*, as the Second Circuit recently held, the plain language and manifest purpose of TRIA establishes that the statute "overrides any jurisdictional or execution immunities granted to [a state agency/instrumentality] by the FSIA and creates an independent basis for the court to exercise subject matter jurisdiction over [an agency/instrumentality's] blocked assets." *Havlish v. Taliban*, 152 F.4th 339, 361 (2d Cir. 2025). That decision is correct. TRIA's text states in unequivocal terms that, in "every" case and notwithstanding "any" other provision of law, the blocked assets of "any" agency/instrumentality of a terrorist party are

subject to attachment or execution. TRIA's stated purpose, meanwhile, was to provide a "comprehensive" mechanism for the enforcement of judgments against terrorists. PDVSA's invocation of sovereign immunity ignores that statutory language and would frustrate Congress's goal.

*Second*, the political question doctrine has no bearing on this case. PDVSA seems to believe that a court could find it to be an agency/instrumentality of the Maduro regime only by first labeling Maduro the legitimate President of Venezuela. But that simply is not so. If PDVSA provided material support to Maduro and his regime in their commission of illegal acts—as the U.S. government has alleged and as the district court will confirm on remand—then PDVSA was the agency/instrumentality of a terrorist party, whatever Maduro's governmental status. For this purpose, it is immaterial whether Maduro, rather than one of his democratic opponents, is recognized by the United States as the legitimate President of Venezuela.

*Third*, PDVSA's complaints about supposedly defective service are insubstantial. In this case, there is no jurisdiction on interlocutory appeal to address arguments about service of process or personal jurisdiction, as numerous courts—including this one—have held. In any event, the

Albáns substantially complied with the FSIA's service requirements and also will show on remand that PDVSA received actual notice of the action, which is sufficient to provide effective service.

In all, the decision below gives the Albán family an opportunity to obtain some justice for the torture and murder of Fernando Alberto Albán. That decision should be affirmed.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331.

This Court has jurisdiction over some but not all aspects of PDVSA's appeal. The Court "has jurisdiction over interlocutory orders denying claims of sovereign immunity under the FSIA." *S & Davis Int'l, Inc. v. Rep. of Yemen*, 218 F.3d 1292, 1297 (11th Cir. 2000); *see* 28 U.S.C. § 1291. It therefore has jurisdiction to resolve PDVSA's assertion (Br. 29-43) of sovereign immunity. As explained in greater detail below, however, the Court does not have jurisdiction to consider PDVSA's service-of-process claim. *See* pp. 49-52, *infra*.

## STATEMENT OF THE ISSUES

I. Whether TRIA overrides the jurisdictional immunity of a state agency or instrumentality that also was the agency or instrumentality of a terrorist party.

II. Whether the political question doctrine precludes a court from determining whether PDVSA served as the agency or instrumentality of the Maduro regime for acts committed by Maduro in a private capacity.

III. Whether this Court has jurisdiction to address PDVSA's argument that service of process was inadequate and, if jurisdiction exists, whether service providing actual notice of the suit was sufficient.

## STATEMENT OF THE CASE

### I. Legal Framework

1. The FSIA generally provides foreign states, and their agencies and instrumentalities, with immunity from (a) the jurisdiction of U.S. courts ("jurisdictional immunity") and (b) execution upon their assets ("execution immunity"). *See* 28 U.S.C. §§ 1330, 1602 *et seq.*; *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 272 (2023). But the FSIA also contains exceptions. One exception applies to specified "commercial activities" and "commercial property" of foreign states. 28 U.S.C. §§ 1602,

1603(d), 1605(a)(2), 1610(b)(2). Another is addressed to particular acts of state terrorism. *See* 28 U.S.C. §§ 1605A, 1605B.

2. Twenty-five years after the enactment of the FSIA, following the terrorist attacks of September 11, 2001, Congress enacted TRIA, Pub. L. No. 107–297, § 201, 116 Stat. 2322, 2337. Congress drafted TRIA as a freestanding measure, not an amendment to the FSIA. As relevant here, TRIA provides:

> Notwithstanding any other provision of law, and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA § 201(a). The statutory provision appears in the U.S. Code as a note following 28 U.S.C. § 1610. *See Stansell v. Revolutionary Armed Forces of Colombia*, 771 F.3d 713, 722 n.1 (11th Cir. 2014) ("*Stansell II*").

To execute on a judgment under TRIA § 201(a), a plaintiff must establish that (1) "she has obtained a judgment against a terrorist party that is either for a claim based on an act of terrorism or for a claim for

which a terrorist party is not immune"; (2) the assets are blocked as that term is defined in TRIA"; (3) the total amount of the execution does not exceed the amount of compensatory damages; and (4) "[i]f the party wishes to execute against the assets of a terrorist party's agency or instrumentality, the party must further establish that the purported agency or instrumentality is actually an agency or instrumentality." *Stansell II*, 771 F.3d at 723. Unlike the FSIA, TRIA does not itself define the term "agency or instrumentality."

One element of enforcing a judgment under TRIA is that the assets subject to execution are "blocked." The statute defines blocked assets as "'any asset seized or frozen by the United States under section 5(b) of the Trading With the Enemy Act (TWEA) or under sections 202 and 203 of the International Emergency Economic Powers Act (IEEPA)], 50 U.S.C. § 1701-1710].'" *Stansell II*, 771 F.3d at 723 (quoting TRIA § 201(d)(2)(A)) (original brackets omitted). "Assets are blocked when the United States Department of the Treasury Office of Foreign Assets Control (OFAC) designates the owner of the assets as a Specially Designated Narcotics Trafficker (SDNT)." *Id.*

## II. Factual Background

### A. Maduro And PDVSA

In 2013, defendant Maduro assumed the Presidency of Venezuela and became the leader of the so-called "Cartel of the Suns," a group that engages in the sale of illegal drugs, money laundering, and other illegal conduct.[1] Dkt. 1 at ¶¶ 40, 53.[2] The other defendants are associates of Maduro who were involved in his illegal activity. *Id.* The U.S. Department of Justice has indicted Maduro and the other defendants for narco-terrorism, money laundering, and/or other crimes, alleging that Maduro engaged in a "'corrupt and violent narco-terrorism conspiracy.'" Dkt. 1 at 11 (quoting Superseding Indictment, ¶ 1 *United States v. Maduro*, 11-cr-205 (S.D.N.Y. 2011)). According to the Justice Department, Maduro and his associates sent cocaine into the United States, often using airplanes, and laundered drug money in this country. *Id.*, ¶¶ 14c-e.

---

[1] Citations to the record are formatted as Dkt. [number] at [page number]. PDVSA's brief is cited as Br. [page number].

[2] Upon the Entry of Final Judgment (Dkt. 91), the facts alleged in the complaint were established as the facts of the case. *See* Dkt. 56 at 6 (quoting *Buchanan v. Bowman*, 820 F.2d 359, 361 (11th Cir. 1987).

PDVSA is the state oil company of Venezuela. *PDVSA US Litig. Tr. v. LukOil Pan Americas LLC*, 65 F.4th 556, 559 (11th Cir. 2023). Despite its status as a state agency/instrumentality, it was (and remains) closely connected to Maduro and the Cartel of the Suns, having "engaged in a detailed money laundering scheme in privity with the Maduro regime." Dkt. 401 at 17. Generally, PDVSA laundered criminally derived funds on behalf of the Cartel through sophisticated schemes including falsified invoices for oil sales, infrastructure projects, and cyclical fixed-asset purchases. Dkt. 94-5 at ¶¶ 30-38. The U.S. State Department has said that "'Maduro's most egregious corruption scheme involved embezzlement from" PDVSA. Dkt. 94 at 11 (quoting Dkt. 94-32 at 2).

### B. The United States Blocked Assets Belonging To Maduro And PDVSA.

In July 2017, OFAC sanctioned Maduro for "'undermining democracy in Venezuela.'" Dkt. 1 at ¶ 19 (quoting Press Release, U.S. Dep't of the Treasury, Treasury Sanctions the President of Venezuela, ¶ 1 (July 31, 2017)).

Following an illegitimate election, Maduro declared himself President of Venezuela on January 10, 2019. Dkt. 1 at ¶¶ 41, 43. Venezuela's freely elected National Assembly then declared Maduro a "'usurper'"

and, on January 23, 2019, the Assembly declared Maduro-opponent Juan Guaidó President. *Id.* ¶ 44. The same day, the United States recognized Guaidó as the President of Venezuela. *Id.* ¶ 45. *See generally OI Eur. Grp. B.V. v. Bolivarian Rep. of Venezuela*, 73 F.4th 157, 164 (3d Cir. 2023), *cert. denied*, 144 S. Ct. 549 (2024) (describing Venezuelan elections and government); *see also Venezuelan Opposition Strips Juan Guaidó of 'Presidential' Role*, Associated Press (Dec. 30, 2022), https://perma.cc/3ZZT-Y5WJ (the U.S. no longer recognizes Guaidó as the president).

Later in January 2019, OFAC responded to corruption and abuse at PDVSA by sanctioning the company under IEEPA and Executive Order 13850 to "'prevent further diverting of Venezuela's assets by Maduro.'" Dkt. 94 at 18 (quoting Dkt. 94-40 at 1); *see* 84 Fed. Reg. 3282. As OFAC explained, "'PDVSA has long been a vehicle for corruption.'" Dkt. 110 at 7 (quoting Dkt. 94-40 at 1).

In February 2019, the National Assembly of Venezuela enacted a statute giving Guaidó the authority to appoint an ad hoc administrative board to manage PDVSA. *See Caballero v. Fuerzas Armadas*

*Revolucionarias de Colombia*, 2021 WL 1884110, at *3 (W.D.N.Y. May 11, 2021).[3] Nevertheless, Maduro has "continued to exert significant control over PDVSA." *Id.* at *2; *see OI Eur. Grp. B.V.*, 73 F.4th at 172 ("the Maduro Government[ maintains] extreme control of PDVSA in Venezuela and abroad, and the Guaidó Government[ maintains] substantial control of PDVSA's American operations"). Thus, in August 2019, President Trump issued Executive Order 13884, which blocked "all property and interest in property of the Government of Venezuela" "'in light of the continued usurpation of power by Nicolas Maduro and persons affiliated with him, as well as human rights abuses, including arbitrary or unlawful arrest and detention of Venezuelan citizens . . . .'" Dkt. 94 at 18-19 (quoting EO 13884); s*ee* 84 Fed. Reg. 38843. The Executive Order specifically defined "Government of Venezuela" to include "P[D]VSA." *Id.* at 18-19.

---

[3] The Ad Hoc Board has "the power to exercise the legal representation of PDVSA and its subsidiaries." *Caballero*, 2021 WL 1884110, at *3 (quotation marks and brackets omitted). In this appeal, the Ad Hoc Board is directing PDVSA's representation. *See* Br. 10. Elsewhere, Venezuela and the Ad Hoc Board have hired different counsel to speak for PDVSA in the same case. *See PDVSA US Litig. Tr.*, 65 F.4th at 559.

In 2020, notwithstanding the appointment of PDVSA's Ad Hoc Board, OFAC identified "PDVSA as the 'primary conduit for corruption' by Maduro and described PDVSA as a Maduro-created 'secret network to evade sanctions' and to 'plunder Venezuela's resources for personal gain.'" Dkt. 110 at 7 (quoting Dkt. 94-95 at 1). Also in 2020, OFAC blocked Learjet YV2739, a subject of this appeal, and other aircraft that are the "property of" PDVSA. Dkt. 94-17 at 1-2. And in 2021, OFAC stated that the "'Maduro regime has continued to use [PDVSA] as its primary conduit for corruption.'" Dkt. 94 at 18 (quoting *OI Eur. Grp. B.V. v. Bolivarian Rep. of Venezuela*, 663 F. Supp. 3d 406, 425 (D. Del. 2023)).

### C. Maduro And His Co-Defendants Murdered Fernando Alberto Albán.

In 2018, Albán travelled from Venezuela to the United States to speak against the Maduro regime and to visit his wife and children, who had sought asylum in the United States. Dkt. 1 at ¶ 4. In the United States, Maduro's agents stalked Albán and marked him for retribution. *Id.* When Albán returned to Venezuela, Maduro's associates kidnapped, tortured, and murdered him. *Id.* Maduro's security forces then threw Albán's body from a ten-story building, mutilating his corpse. *Id.* ¶ 11. After his death, the Maduro regime defamed Albán, falsely claiming that

he had committed suicide after being found with child sex-abuse material. *Id.* ¶¶ 11, 12. The regime also raided and destroyed the business owned by Albán and his wife, eliminating his widow's income. *Id.*

## III. Procedural Background

### A. The Albán Family Obtained Writs To Satisfy A $217 Million Judgment Against Maduro And His Co-Defendants.

In February 2022, the Albán family brought this suit in Florida against Maduro and additional defendants involved in Albán's murder. Dkt. 1 at ¶¶ 19-26. The Albáns alleged, *inter alia*, that the defendants had violated the Florida Anti-Terrorism Act. *Id.* ¶¶ 201-84. After the defendants failed to respond, in August 2023 the district court entered a final default judgment against them for $217 million. Dkt. 91 at 1; Dkt. 110 at 2.

The Albáns then moved for writs of execution and garnishment on assets belonging to "Defendant's agencies or instrumentalities" pursuant to Florida law. Dkt. 401 at 2. As the magistrate judge explained, that law sets out a three-step process for effecting a writ of execution: "First, a writ of execution issues. §§ 56.031, 56.061, Fla. Stat." Dkt. 110 at 3. Next, the U.S. Marshal "levies on the property." § 56.061, Fla. Stat.; 28 U.S.C.

§ 566. *Id.* Finally, "the U.S. Marshal advertises a notice of sale" before "selling the property. Fla. Stat. § 56.21." *Id.*[4]

Here, the Albáns sought a writ of execution against a Learjet owned by PDVSA, explaining that any sovereign immunity held by PDVSA is overcome both by TRIA and by the FSIA's commercial-activities exception. Dkt. 94 at 29-40. The magistrate judge ordered that the Albáns provide evidence that they served PDVSA and the party in possession of the Learjet. Dkt. 102 (paperless order). The Albáns "mailed a copy of the Motion to the title owner of the Aircraft," PDVSA, "as provided in Fla. Stat. § 56.21," and also served an additional copy "in compliance with Rule 4, Federal Rules of Civil Procedure." Dkt. 105 at 1-2.

In June 2024, the magistrate judge, "lean[ing] heavily on OFAC's determinations regarding PDVSA," found that PDVSA was an agency or

[4] Execution of a judgment on property "accord[s] with the procedure of the state where the court is located, but a federal statute governs to the extent it applies." Fed. R. Civ. P. 69(a)(1). *See Stansell II*, 771 F.3d at 733. Accordingly, Florida law governs the procedure for obtaining a writ of execution or garnishment. *Id.* Claimants are entitled to "actual notice of the postjudgment proceedings against them" pursuant to Florida law. *Id.* at 727, 730. Claimants are also entitled "to be heard before execution, though not necessarily before attachment." *Id.* at 729.

instrumentality of the Maduro regime and that TRIA authorized execution against assets held by PDVSA. Dkt. 110 at 6-7. In July 2024, the district court adopted the Report and Recommendation in relevant part, Dkt. 113, and issued a writ of execution against the Learjet, Dkt. 114. The writ was executed in October 2024. Dkt. 217. The Albáns also obtained writs of garnishment against PDVSA and its subsidiaries,[5] filed motions for turnover judgments against PDVSA and its subsidiaries,[6] and obtained a turnover judgment for assets belonging to PDVSA and its subsidiaries.[7] Dkt. 401 at 2-3.

### B. PDVSA Sought To Vacate The Writs.

1. Weeks after execution of the writ against the Learjet, in late November 2024, PDVSA filed a motion seeking to (1) vacate the district

---

[5] The writs of garnishment, all for $217 million, were: Dkt. 134 (Pierce Manufacturing, Inc.); Dkt. 150 (M&T Bank Corp.); Dkt. 165 (under seal); Dkt. 180 (Shell Trading Company LP); Dkt. 198 (StoneX Group, Inc.); Dkt. 237 (BBVA Compass Bank / PNC Bank); Dkt. 380 (under seal).

[6] The motions for turnover judgments were Dkt. 161 (Amended Mot. for Judgment TRIA Turnover Judgment Re Pierce Manufacturing) and Dkt. 256 (Mot. for Judgment TRIA Turnover Judgment STUSCO (PDVSA Funds)).

[7] Dkt. 250 (Turnover Judgment for funds held by M&T Bank Corp).

court order adopting the magistrate judge's finding that PDVSA is an agency or instrumentality of the Maduro regime; (2) dissolve or deny various writs of garnishment or turnover motions against PDVSA or its subsidiaries; and (3) dismiss this action as to PDVSA. Dkt. 310 at 1. PDVSA contended that TRIA did not apply, that service of process was defective, and that the political question doctrine precluded resolving the case because a court could not award relief without first identifying the legitimate government of Venezuela, a matter that is disputed. *Id.* at 5-12.

The Albán family opposed. The Albáns reiterated that PDVSA lacks sovereign immunity under both TRIA and the FSIA's commercial-activities exception. Dkt. 344 at 3, 5, 6. They argued that service on PDVSA was proper under the FSIA's service provision, 28 U.S.C. § 1608(b), and that PDVSA had actual notice of the suit. *Id.* at 10-11. They maintained that the issue here is not a political question because the Executive Branch had determined that PDVSA was an agency/instrumentality of the Maduro regime and, in any event, PDVSA had acted as an agency/instrumentality of the Maduro regime prior to U.S. recognition of Guaidó's

Interim Government. *Id.* at 15. And the Albáns demonstrated that, under any standard, PDVSA failed to rebut evidence that it was an agency/instrumentality of the Maduro regime. *Id.* at 15-19.

2. Following review by a magistrate judge, the district court rejected PDVSA's arguments in substantial part, although the court remanded the case to the magistrate judge for specified additional factual findings.

*First*, the district court held that TRIA gave it subject matter jurisdiction over PDVSA. Dkt. 583 at 3; *see* Dkt. 401 at 5 (plain language of TRIA and this Court's precedent established subject matter jurisdiction under TRIA). The court did not address the Albáns' alternative argument that subject matter jurisdiction also exists under the FSIA commercial-activities exception.

*Second*, the district court agreed that PDVSA's contacts with Florida satisfied the requirements of due process. Dkt. 583 at 3; *see* Dkt. 401 at 13 (PDVSA made "no meaningful effort to undermine [the family's] argument that PDVSA was used as a cog in Defendants' money laundering scheme; and more specifically, that PDVSA sent money from its

accounts to various contractors in South Florida to perpetuate a money laundering and bribery scheme”).

*Third*, the district court agreed that the “Political Question doctrine d[id] not prohibit the Court from adjudicating the issues.” Dkt. 583 at 3; *see* Dkt. 401 at 15 (magistrate explaining the political question doctrine was not prohibitive because the Executive Branch had already “identifie[d] PDVSA as an agency or instrumentality and block[ed] its assets”).

*Fourth*, the district court agreed that this Court’s decision in “*Stansell II* sets forth the proper standard to determine agency or instrumentality [status] under TRIA.” Dkt. 583 at 3; *see* Dkt. 401 at 16 (same).

The district court remanded the case for further fact-finding on two points: “(1) whether PDVSA had actual notice of the proceedings such that service was proper and (2) whether PDVSA is an agency or instrumentality of the Maduro regime.” Dkt. 583 at 3.

On both issues, the magistrate judge had recommended ruling in favor of the Albán family. On the first, the magistrate found service sufficient to establish personal jurisdiction because “PDVSA concede[d] that it received actual notice of [the family’s] enforcement efforts,” making “any technical non-compliance with the FSIA . . . inapposite.” Dkt. 401 at

9-8 (citing *Harris Corp. v. Nat'l Iranian Radio & Television*, 691 F.2d 1344 (11th Cir. 1982) and collecting cases). And on the second, the magistrate found that "[m]yriad evidence supported [the] determination that PDVSA is an agency or instrumentality" of the Maduro regime, noting that "OFAC has blocked PDVSA's assets and deemed it to be an agency or instrumentality [of Maduro]" and that the Albáns offered "persuasive, sworn findings that PDVSA has engaged in a detailed money laundering scheme in privity with the Maduro regime." *Id.* at 16-17.[8] On this last point, PDVSA "presented no counter-evidence." *Id.* Nevertheless, the district court found that there were "disputed questions of fact" on these issues and remanded to the magistrate judge "for an evidentiary hearing." Dkt. 583 at 3.

[8] In seeking a writ of execution against the Learjet, the Albán family filed a declaration from Douglas C. Farah that described PDVSA's involvement in Maduro's criminality, such as laundering money, providing aircraft for smuggling cash, and assisting with manufacturing narcotics. Dkt. 94-5 at 11-34. The Albáns cited this declaration in their opposition to PDVSA's motion to vacate. Dkt. 344 at 11. Later, after the magistrate judge issued his Report and Recommendation, the Albáns included additional declarations from Farah when seeking writs of garnishment against PDVSA subsidiaries. *See* Dkt. 405-1 and Dkt. 406-1. The magistrate judge denied PDVSA's motion to strike this second set of declarations. *See* Dkt. 413 (Motion to Strike); Dkt. 635 (paperless order).

PDVSA has taken an interlocutory appeal from that remand ruling. Dkt. 586. Following filing of the notice of appeal, the district court stayed proceedings against PDVSA but found that a stay was not warranted "as to PDVSA's subsidiaries or the property of PDVSA's subsidiaries." Dkt. 665.[9]

---

[9] In its brief, PDVSA makes numerous factual representations that have no bearing on the legal issues on appeal. These include: (1) a description of other assets garnished, which are not part of this appeal (Br. 18); (2) information about an interpleader complaint from JPMorgan Chase Bank (Br. 18, 23); (3) complaints about the number of filings in this case made *ex parte* and under seal (Br. 19); (4) an account of the status of a turnover proceeding involving Petromonogas, a PDVSA subsidiary and not a party to this appeal (Br. 26); (5) a description of a writ against Petrocedeño, also irrelevant because Petrocedeño is not a party to this appeal (Br. 26); and (6) a listing of many supposedly almost identical actions pending around the country involving other plaintiffs. Br. 27-29. Because they are not material to resolving this appeal, we do not address these points in detail. We note, however, that some of PDVSA's representations are inaccurate or misleading. For example, PDVSA states that its subsidiary Petrocedeño "did not have notice and thus did not appear" in response to a writ. Br. 26 (discussing Dkt. 537, 616, 674). In fact, Petrocedeño (and PDVSA) made a "limited appearance" and filed an opposition to the writ and the expedited motion, Dkt. 647, which the magistrate judge acknowledged, Dkt. 674 at 1. PDVSA further implies that the Albán family acted improperly in obtaining writs *ex parte* (Br. 19, 25-26); in fact, Florida law contemplates that parties will obtain *ex parte* writs (*see Stansell II*, 771 F.3d at 729) and the district court expressly permitted the Albán family to seek writs against PDVSA's subsidiaries, which are not parties to this appeal. *See* Dkt. 665.

## SUMMARY OF ARGUMENT

PDVSA's brief is long and convoluted, but its arguments are of limited scope—necessarily so, as the case is before this Court on interlocutory appeal. PDVSA advances three arguments: that it has jurisdictional sovereign immunity and is not subject to suit at all; that the effort to hold it liable as an agency/instrumentality of the Maduro regime presents a nonjusticiable political question; and that it was not properly served. Each is flawed.

A. PDVSA has no sovereign immunity that is enforceable here. If PDVSA acted as an agency/instrumentality of the Maduro regime—as must be assumed true for purposes of this appeal—TRIA's express language makes PDVSA subject to suit in an action to enforce the Albáns' existing judgment against Maduro. Nothing in TRIA's text limits a state agency/instrumentality's liability to cases where there is a separate waiver of the entity's jurisdictional immunity. The point is confirmed by TRIA's "notwithstanding" clause, the plain terms of which establish that the FSIA's jurisdictional immunities may not stand in the way of an enforcement action under TRIA. And TRIA's purpose leaves no room to doubt that the statute means what it plainly says, showing that Congress

meant to create what it described as a "comprehensive[]" mechanism with which to provide relief to victims of terrorism. The FSIA's commercial-activities exception also provides an alternative ground for displacing any PDVSA immunity.

B. PDVSA's political question argument is based on a flawed premise. PDVSA is wrong to assume that a court's determination that it was an agency/instrumentality of the Maduro regime would label Maduro the legitimate President of Venezuela. In fact, this Court has explained that *any* entity that provides material support to a terrorist may be an agency/instrumentality *of the terrorist*. Here, PDVSA provided that support to Maduro as he committed acts of terrorism, whatever his governmental status. If Maduro were acting in a private capacity as leader of an illegitimate regime when he committed those acts of terrorism, that would not make the question in this case "political," even if PDVSA itself otherwise functions as an agency/instrumentality of Venezuela.

C. This Court lacks jurisdiction to consider PDVSA's service-of-process argument on interlocutory appeal; that argument is not collateral to the merits of the case because, among other reasons, the contention is effectively reviewable on appeal from final judgment (unlike denial of an

immunity claim). But the service argument is also wrong. It must be assumed for present purposes that PDVSA received actual notice of this suit (as the magistrate judge found), which is enough to provide effective service, even if there were a technical failure to comply with the FSIA's particular service requirements—as this Court has held. And, in fact, the Albáns demonstrated substantial compliance with the FSIA's service provision by serving Florida's Secretary of State, an agent authorized by law to receive service for foreign entities.

## ARGUMENT

### I. Standard of Review

This Court reviews issues of subject matter jurisdiction *de novo*. *United States v. Grimon*, 923 F.3d 1302, 1305 (11th Cir. 2019). It "may affirm on any ground supported by the record, regardless of whether that ground was relied upon or even considered below." *Waldman v. Conway*, 871 F.3d 1283, 1289 (11th Cir. 2017).

### II. The Courts Have Jurisdiction To Resolve The Claims Against PDVSA.

PDVSA's principal contention on appeal is that its sovereign immunity deprives the courts of subject matter jurisdiction to resolve this case. It recognizes that TRIA overcomes its "execution immunity." But

PDVSA nevertheless contends that "recovery under TRIA requires the court to first have subject-matter jurisdiction over the foreign state," so that execution under TRIA against the agency or instrumentality of a foreign state is permissible only if there is a *separate* waiver of that entity's jurisdictional sovereign immunity. Br. 32; *see id.* at 30-34.

PDVSA is wrong. The plain language and manifest purpose of TRIA establishes that the statute abrogates *all* aspects of PDVSA's immunity. Thus, in the most recent appellate treatment of the issue, the Second Circuit rejected the precise reading of TRIA advanced here by PDVSA, holding in the clearest terms "that TRIA § 201(a) supersedes the FSIA's jurisdictional immunity provisions in addition to its execution immunity provisions." *Havlish*, 152 F.4th at 360.[10] Indeed, PDVSA itself recognizes

---

[10] In relevant part, *Havlish* is identical to this case. There, plaintiffs obtained a judgment against the Taliban, a nonstate actor, for acts of terrorism. They sought to enforce that judgment under TRIA by executing against assets held by the Afghan central bank ("DAB"), an agency/instrumentality of the Afghan state. *See* 152 F.4th at 348-49. The Second Circuit held that TRIA overcame both DAB's jurisdictional and its execution immunity. *Id.* at 358-361. The court then went on to hold that the plaintiffs nevertheless could not collect on the judgment under TRIA because DAB was not an agency/instrumentality of the Taliban at the relevant time (*see id.* at 361-65), a holding that has no bearing here, where PDVSA has been an agency/instrumentality of Maduro at all relevant times. Judge Sullivan dissented from that aspect of the holding, while

that its approach cannot be squared with the Second Circuit's reasoning. Br. 36-37. For several reasons, the Second Circuit is correct.

### A. TRIA Abrogates PDVSA's Immunity.

#### 1. TRIA's text establishes liability here.

TRIA's plain text unambiguously establishes PDVSA's liability. In relevant part, the statute provides:

> Notwithstanding any other provision of law, and except as provided in subsection (b), in *every* case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism . . . the blocked assets of that terrorist party (including the blocked assets of *any* agency or instrumentality of that terrorist party) *shall* be subject to execution or attachment in aid of execution in order to satisfy such judgment.

TRIA § 201(a) (emphases added). "Terrorist party" is defined as a "terrorist," "terrorist organization," *or* a "foreign state designated as a state sponsor of terrorism." TRIA § 201(d)(4). This language could not be more expansive: it reaches "any" agency or instrumentality of "any" terrorist party (without regard to whether the agency or instrumentality is a

---

expressly agreeing "that TRIA abrogates both jurisdictional and execution immunity and independently provides a grant of subject matter jurisdiction over post-judgment execution and attachment proceedings." *Id.* at 373 (Sullivan, J., concurring in part and dissenting in part).

foreign state ordinarily entitled to immunity under the FSIA), providing that blocked assets of that entity "shall" be subject to execution in "every" case. *See United States v. All Funds on Deposit with R.J. O'Brien & Assocs.*, 783 F.3d 607, 611, 621 (7th Cir. 2015) (TRIA is "a sweeping statute" that uses "words of broad application").

The liability created by TRIA reaches this case. The Albáns obtained an enforceable judgment against a terrorist party (Maduro) on a claim based on an act of terrorism (the politically motived torture and murder of Mr. Albán). OFAC has blocked the assets at issue. And it must be assumed for present purposes that the blocked assets are those of an agency or instrumentality Maduro, terrorist party, as the Albáns established and, on remand, will show is true of PDVSA. *See generally Stansell II*, 771 F.3d at 723 (describing elements of TRIA claim).

TRIA's plain text also defeats PDVSA's central assertion that TRIA's literal language is overcome by the more general (and pre-TRIA) jurisdictional immunity created by the FSIA. *See* Br. 29-31, 32-33. TRIA provides that its liability-creating terms apply "[n]otwithstanding *any* other provision of law." TRIA § 201(a) (emphasis added). And as the

Second Circuit noted, this "first clause" of TRIA "carries great weight in [the] analysis of how TRIA interacts with the FSIA." *Havlish*, 152 F.4th at 359.

"The Supreme Court has observed that 'notwithstanding' clauses, like the one contained in TRIA, have generally been 'interpreted . . . to supersede all other laws,' and that to provide a 'clearer statement [of a drafter's intent that they so supersede] is difficult to imagine.'" *Havlish*, 152 F.4th at 359 (quoting *Bank Markazi v. Peterson*, 578 U.S. 212, 217 n.2 (2016)) (ellipses and bracketed material added by the Second Circuit; further quotation omitted). "Indeed," the Second Circuit added, "the Supreme Court has spoken in such terms of the TRIA's *own* 'notwithstanding' clause." *Id.* (emphasis added).[11] *See also Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993) (noting general breadth of "notwithstanding" clauses); *Miccosukee Tribe of Indians of Fla. v. U.S. Army Corps of Eng'rs*, 619 F.3d 1289, 1301 (11th Cir. 2010) (same); *see also Stansell v.*

---

[11] The Second Circuit noted the Supreme Court's observation that "the TRIA 'takes precedence over "any other provision of law"' and, therefore, is not limited by 'the FSIA's central-bank immunity provision.'" *Havlish*, 152 F.4th at 359 n.103 (quoting *Bank Markazi*, 578 U.S. at 217 n.2).

*Revolutionary Armed Forces of Colombia*, 45 F.4th 1340, 1362 n.11 (11th Cir. 2022) ("*Stansell V*") ("'there are no . . . limit[s]' to the scope of the 'notwithstanding' clause in the TRIA" (quoting *All Funds*, 783 F.3d at 620-21)). TRIA's "notwithstanding" clause therefore must be read as a "'broad provision' that overcomes any other provision of law that 'conflicts with [the] TRIA'"—including the FSIA. *Havlish*, 152 F.4th at 359 (footnotes and citations omitted).[12]

Any other reading would posit that "TRIA's subject matter jurisdiction is curtailed by the very law it was intended to supersede." *Havlish*, 152 F.4th at 361. The Second Circuit has explained why that approach is insupportable given TRIA's plain text:

> It would mean that the TRIA, despite its clear language stating that the blocked assets of a terrorist party's agency or instrumentality "shall be subject to execution or attachment" notwithstanding "any other provision or law," would have a built-in exception for certain entities that, in addition to being the agencies or instrumentalities of a terrorist party, were also separately designated as the agencies or instrumentalities of a foreign state granted immunity under the FSIA. Such

[12] Nothing can be inferred from TRIA's placement in the notes of the FSIA. As a choice made by the Office of Law Revision Counsel, not Congress, that placement "should be given no weight." *North Dakota v. United States*, 460 U.S. 300, 310 n.13 (1983). *See Havlish*, 152 F.4th at 360; *Weinstein v. Islamic Rep. of Iran*, 609 F.3d 43, 49 (2d Cir. 2010).

> an interpretation would betray the plain language of the TRIA's "notwithstanding" clause by limiting its jurisdiction with back-reference to an FSIA immunity determination—marking an unmistakable conflict between the TRIA and FSIA that is flatly prohibited by §201(a)'s "notwithstanding" clause.

*Id.*

And there is more. TRIA's legislative evolution shows that Congress inserted the broad "notwithstanding" clause advisedly. As introduced in the House of Representatives, the bill that became TRIA included no prefatory clause, providing simply that assets of terrorist organizations would be available to satisfy judgments against those organizations. H.R. Conf. Rep. No. 107-300, at 9 (2001). But with the goal of expanding opportunities for recovery, the House subsequently inserted the "in every case" language to TRIA (147 Cong. Rec. H8572-04 § 15(e)(1)), with the Senate later adding the "notwithstanding" clause as ultimately enacted. 148 Cong. Rec. S5664-01 § 11(a). That language therefore was the product of a conscious congressional effort to clarify TRIA's already broad scope. And in doing so, Congress added the "notwithstanding" limitation to existing language creating liability "except as provided in subsection

(b) [of TRIA § 201]," thus doubling down on the statutory dictate that there are *no* implicit exceptions to TRIA's application.[13]

In these circumstances, the language of TRIA resolves this appeal, making it "'*clear beyond cavil* that section 201(a) of the TRIA provides courts with subject matter jurisdiction over post-judgment execution and attachment proceedings against property held in the hands of an instrumentality of the judgment-debtor.'" *Havlish*, 152 F.4th at 360 (quoting *Weinstein v. Islamic Rep. of Iran*, 609 F.3d 43, 50 (2d Cir. 2010) (emphasis added by the court)).

#### 2. Congress meant TRIA to establish a comprehensive mechanism for recovery.

Although TRIA's language is dispositive, any ambiguity "would be resolved in plaintiff[s'] favor by the legislative history." *Havlish*, 152 F.4th at 361 n.119 (quoting *Weinstein*, 609 F.3d at 49-50). At every turn leading to TRIA's enactment, Congress emphasized the expansive remedies made available by the statute to victims of terrorism.

---

[13] TRIA § 201(b) allows the President to preclude application of TRIA's mandate in specified circumstances.

As this and other courts have recognized, "Congress's purpose in enacting TRIA § 201 was to 'deal comprehensively with the problem of enforcement of judgments rendered on behalf of victims of terrorism.'" *Stansell II*, 771 F.3d at 732 (quoting H.R. Conf. Rep. No. 107-779, at 27 (2002) (citation and internal quotation marks omitted)); *see also*, *e.g.*, *Weinstein*, 609 F.3d at 50; *Smith ex rel. Estate of Smith v. Federal Reserve Bank of N.Y.*, 346 F.3d 264, 270, 271 n.7 (2d Cir. 2003). And obviously, a reading of TRIA that precludes satisfaction of judgments against terrorists through execution or attachment aimed at the terrorists' agencies/instrumentalities would be far from the desired "comprehensive[]" treatment of "the problem of enforcement of judgments rendered on behalf of victims of terrorism."

Individual members of Congress, including TRIA's sponsors, also consistently emphasized the need for an effective mechanism with which to compensate the victims of terrorism in general, and with which to proceed against the agencies/instrumentalities of terrorists in particular. Indeed, Rep. Fossella, a sponsor and principal author of TRIA, specifically noted that the statute was designed to overcome obstacles to enforcing judgments that were posed by agencies/instrumentalities of terrorists

asserting sovereign immunity. He complained that "agencies and instrumentalities [of terrorists] can claim foreign sovereign immunity against victims in U.S. courts" and explained that TRIA would "expos[e] these agencies and instrumentalities to liability." 148 Cong. Rec. H6134 (Sep. 10, 2002) (Rep. Fossella). In contrast, *no* participant in the TRIA congressional debate suggested that, once an enforceable judgment against a terrorist party had been obtained, plaintiffs would face a separate jurisdictional bar when seeking to execute against the terrorist's agency or instrumentality. *See generally* 148 Cong. Rec. H6133-05, H6135-37 (comments from Rep. Baker, Rep. Watt, & Rep. Shays).

And that is what would be expected. "'At the time the FSIA was passed, the international community viewed execution against a foreign state's property as a greater affront to its sovereignty than merely permitting jurisdiction over the merits of an action.'" *Havlish*, 152 F.4th at 360 n.115 (citations omitted). "It can therefore be of little surprise that the TRIA, which indisputably abrogates attachment and execution immunity—which [courts] would characterize as the 'greater affront'—also abrogates jurisdictional immunity—the lesser affront." *Id*. That likewise is the commonsense interpretation of TRIA: "it would be contradictory for

Congress in the same breath to expressly make assets subject to execution and at the same time make the owner of those assets immune from suit to recover those assets." *Weininger v. Castro*, 462 F. Supp. 2d 457, 488 (S.D.N.Y. 2006).

#### 3. PDVSA's arguments in support of sovereign immunity are wrong.

Against the plain language and stated purpose of TRIA, which PDVSA largely ignores, PDVSA offers a hodge-podge of arguments in support of sovereign immunity. All are insubstantial.

**a.** PDVSA principally insists that TRIA "'concerns the rights of persons who already have in hand valid judgments against terrorist parties to recover assets in satisfaction of those judgments.'" Br. 30-31 (quoting *Does 1-7 v. Taliban*, 101 4th 1, 9 (D.C. Cir. 2024)). That assertion is correct, but offers PDVSA no help because the Albán family *does* have just such a judgment in hand, against Maduro and his associates, and the family is, in the language of TRIA, "seeking to recover assets in satisfaction of th[at] judgment[]."

PDVSA's position therefore must hinge on the further proposition that "recovery under TRIA requires the court to first have subject-matter jurisdiction over the foreign state" whose agency/instrumentality

possesses the blocked assets that are the subject of execution. Br. 32. But PDVSA cites no TRIA language or history saying that. To be sure, TRIA comes into play only when the plaintiff already has obtained a judgment against "a terrorist party"; sometimes that terrorist party will be a foreign state, and a judgment against a state terrorist may be entered only when that state's jurisdictional immunity has been overcome. But where a judgment against a terrorist party *has* been entered (as it unquestionably has been here), absolutely no language in TRIA requires an *independent* source of jurisdiction to proceed with a claim for attachment or execution against an agency/instrumentality of that terrorist party, even if the agency/instrumentality *also* is an agency or instrumentality of a foreign state. To the contrary, once it is determined that the subject of the execution or attachment was an agency/instrumentality of the terrorist party that is liable for the plaintiff's judgment (whatever the nature of that terrorist party), TRIA applies by its plain terms.

**b.** PDVSA also is wrong in contending that the Albáns' reading would render superfluous the language of TRIA providing for recovery "in every case" in which a plaintiff obtained judgment on a claim "for which a terrorist party is not immune under [28 U.S.C. § 1605A]" (the

provision that lifts the immunity of foreign states that engage in specified acts of terrorism). Br. 31. PDVSA speculates that there would have been no need for Congress to include this phrase in TRIA unless FSIA jurisdictional immunity otherwise would apply to state agencies/instrumentalities that are the target of attachment under TRIA. But that is not so.

As relevant to PDVSA's argument, TRIA applies in two categories of cases, those where "a person has obtained a judgment against a terrorist party [1] on a claim based on an act of terrorism"; "or [2] for which a terrorist party is not immune under [Section 1605A]." The second category—the one invoked by PDVSA—does not say (and is not how Congress would have phrased the category had it meant to say) that state agencies/instrumentalities are subject to suit under TRIA only if there is a separate displacement of their jurisdictional immunity. Instead, by its plain terms, and by using the disjunctive "or," TRIA identifies a second *set of claims* that are subject to TRIA. Thus, TRIA applies (1) to claims based on an act of terrorism *or* (2) to claims that may not be acts of terrorism under TRIA but that nevertheless create liability under Section

1605A.[14] *See generally Jerez v. Rep. of Cuba*, 777 F. Supp. 2d 6, 29 (D.D.C. 2011) (noting that if a judgment is not based on an "act of terrorism" as defined in TRIA, the judgment "may alternatively be based upon a claim for which the terrorist party is not immune under FSIA 1605(a)(7)"). PDVSA's contrary understanding would render TRIA's use of the disjunctive here nonsensical.

**c.** PDVSA is incorrect in contending, under *Peacock v. Thomas*, 516 U.S. 349, 358-59 (1996), that the Albán family should have filed "a new civil action against PDVSA" on the theory that the Albáns are effectively "litigating the existence of a new liability." Br. 32-33 (citation and quotation marks omitted). That assertion is answered by TRIA itself, which provides in so many words that the blocked assets of a terrorist party's agency/instrumentality "shall be subject to execution or attachment" to satisfy a judgment *against the terrorist party*. Congress thus expressly provided TRIA plaintiffs both jurisdiction and a right to proceed in the

---

[14] These categories of claim are not coterminous. TRIA defines "act of terrorism" by cross-reference to 8 U.S.C. § 1182(a)(3)(B)(iii). *See* TRIA § 201(d)(1). These acts do not include all of the acts that are listed separately in Section 1605A (or its predecessor provision, on the books at the time TRIA was enacted, 28 U.S.C. § 1605(a)(7)).

precise circumstances of this case. This Court has rejected the notion that "a postjudgment action brought pursuant to § 201 of the TRIA is a new and independent civil suit." *Stansell V*, 45 F.4th at 1349. Instead, it operates as an ancillary proceeding under TRIA. *Id.* (discussing *Stansell II*, 771 F.3d at 733).

This is not the assertion of a "new" liability; it is the exercise of an express statutory right to enforce an existing judgment.[15]

**d.** PDVSA likewise is wrong in arguing that the Albáns' approach is inconsistent with *Stansell II*. Br. 34-35 (citing *Stansell II*, 771 F.3d at 729-30). PDVSA evidently means to contend that, because *Stansell II*

---

[15] Even apart from the express terms of TRIA, *Peacock* would offer PDVSA no support. The Court there held that courts lack ancillary jurisdiction over claims asserted in new actions when "there is insufficient factual dependence between the claims raised in [a plaintiff's] first and second suits." 516 U.S. at 355. Even if assertion of the Albán family's claim against PDVSA is characterized as a "second" suit, there is an obvious factual dependence between the claims against the Maduro regime and those against PDVSA, where the execution and attachment necessarily is asserted against an agency/instrumentality of Maduro in an "attempt[] to execute, or to guarantee eventual executability of, a federal judgment." *Id.* at 357; *see id.* at 356 ("we have approved the exercise of ancillary jurisdiction over a broad range of supplementary proceedings involving third parties to assist in the protection and enforcement of federal judgments"). *See also Stansell II*, 771 F.3d at 733 (Florida law treats writs of execution and garnishment as "ancillary proceedings").

held that TRIA's "notwithstanding" clause does not supersede the notice-and-hearing provisions of Florida's garnishment and execution statutes, TRIA also does not displace FSIA jurisdictional immunity. But this contention inverts the meaning of *Stansell II*.

This Court found no preemption there because Florida's notice requirements "simply provide the procedure for executing against the full range of assets that fall within the ambit of TRIA § 201"; those requirements thus "do[] not conflict with TRIA's 'notwithstanding' provision *because the assets TRIA subjects to execution are still subject to execution*." 771 F.3d at 730 (emphasis added). Here, in obvious contrast, PDVSA reads the FSIA to wholly trump TRIA in a significant category of cases, which would mean that blocked assts are *not* subject to execution in those cases. Nothing in *Stansell II* suggests that such an incongruous result is consistent with TRIA.[16]

---

[16] PDVSA's attempt to find support in decisions of other courts fares no better. It reads *Ministry of Defense & Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*, 556 U.S. 366 (2009), to support a narrow scope for the "notwithstanding" clause (Br. 31-32, 35), but the Supreme Court there found that the clause did not preclude application of terms that were added to the law "*by the very same statute, the TRIA*" (556 U.S. at 385-86 (emphasis added)), an observation that obviously has no bearing here—and the Supreme Court subsequently held in *Bank*

**e.** PDVSA relies heavily on the D.C. Circuit's decision in *Does 1-7 v. Taliban*; *see* Br. 35-36. Here, too, PDVSA is wrong.

For one thing, it is not clear that the D.C. Circuit would decline to apply TRIA in this case. There, plaintiffs obtained a judgment against the Taliban and, invoking TRIA, sought to attach Afghan assets being held by the World Bank and International Monetary Fund, entities that had jurisdictional sovereign immunity under the International Organizations Immunities Act, 22 U.S.C. § 288a(b). *See Does 1-7*, 101 F.4th at 5-6. As the D.C. Circuit recognized, however, "neither the World Bank nor the Fund is even arguably an agent or instrumentality of the Taliban." *Id.* at 14. Accordingly, the "agency or instrumentality" language of TRIA that expressly permits enforcement of the judgment here had no application in that case.

---

*Markazi* that the TRIA "notwithstanding" clause has broad application. *See* pp. 28-29 & n.11, *supra*. PDVSA also is wrong in reading *United States v. Holy Land Foundation for Relief & Development*, 445 F.3d 771 (5th Cir. 2006), and *Rubin v. Islamic Republic of Iran*, 709 F.3d 49 (1st Cir. 2013), to preserve jurisdictional immunity. *See* Br. 32. Neither addressed the question here; *Holy Land* concerned criminal forfeiture proceedings (*see* 445 F.3d at 787) and *Rubin* simply held that the assets at issue were not blocked, *see* 709 F.3d at 58.

Having said that, much of the D.C. Circuit's reasoning in *Does 1-7* is inconsistent with the approach advocated here. *See* 101 F.4th at 9-13 (opining that attachment under TRIA against sovereign entities is permissible only when the jurisdictional immunity of those entities already has been breached). But with all respect to that court, its approach does not withstand scrutiny.

The D.C. Circuit premised its analysis on the observation that TRIA "concerns the rights of persons who already have in hand valid judgments against terrorist parties to recover assts" (*id.* at 9)—and as noted, in a case like this one, where the victim of a terrorist act already has a valid judgment against a terrorist party, the D.C. Circuit's reasoning would frustrate what that court itself recognized to be TRIA's central goal. And the D.C. Circuit's view that sovereign immunity presumptively governs under the FSIA because TRIA does not contain express jurisdictional language (*see id.* at 9-12) disregards both the breadth of "notwithstanding" clauses and the particular goal of TRIA to create a "comprehensive" mechanism with which victims of terrorism could obtain relief. *See* pp. 28-29, 31-33 *supra*.

In any event, as PDVSA acknowledges (Br. 36-38), the decisions of the Second Circuit in *Havlish* and of the D.C. Circuit in *Does 1-7* are not easily reconciled. The Second Circuit's decision is the better reasoned.

**f.** Finally, PDVSA gets no additional support from two statements of interest filed in Second Circuit district courts by the Justice Department that read TRIA as preserving the jurisdictional immunity of state agencies/instrumentalities. *See* Br. 31. These statements, now several years old, have not been relied upon by any court. The government has never expressed that view in any appellate brief. The government also has not repeated this view in the intervening years, notwithstanding extensive TRIA litigation during that period. And the Second Circuit, in *Havlish*, rejected the very understanding of Second Circuit law upon which the government had relied in its statements. *Compare Havlish*, 152 F.4th at 360-61, *with* U.S. Statement of Interest 12-13, *Caballero v. FARC*, No. 20-00040, (W.D.N.Y. Sep. 20, 2022), Dkt. No. 125.

Thus, PDVSA's arguments to the contrary are unavailing.

### B. The Political Question Doctrine Has No Application Here.

As a fallback, PDVSA insists (Br. 39-43) that reading TRIA to create jurisdiction here would violate the political question doctrine. But

that doctrine has no bearing on this case. The Albáns agree with PDVSA that it is the role of the political branches, not the courts, to identify the legitimate governments of foreign states. Br. 41-42. But that is not the nature of the district court's inquiry under TRIA.

The Albáns obtained a judgment against Maduro and his associates in the defendants' private capacities. And PDVSA acted as an agency/instrumentality of Maduro *in that private capacity* when it facilitated the acts of terrorism giving rise to this suit. In arguing to the contrary, PDVSA simply assumes that, because it *also* is an agency or instrumentality of Venezuela, it could have acted as an agency/instrumentality of Maduro only if he is the legitimate president of Venezuela. But that is not so; nothing in either TRIA or background legal principles precludes a nonstate actor from hijacking a state agency/instrumentality into facilitating the nonstate actor's acts of terrorism—and, in that way, acting as the *nonstate actor's* agency/instrumentality. The Second Circuit recognized just that possibility in *Havlish*. *See* 152 F.4th at 361.

That is made plain by TRIA. The FSIA specifically defines "agency or instrumentality of a foreign state" for purposes of *that* statute by reference to the entity's connection to a foreign state. 28 U.S.C. § 1603(b);

*see Stansell II*, 771 F.3d at 724. But as this Court has made clear, TRIA (which does not contain an express definition of the term) gives a very different meaning to "agency or instrumentality," as reaching *any* entity that materially assisted the terrorist, acted for or on behalf of the terrorist, or played a significant role in the terrorist's activities—whether the terrorist is a state or nonstate actor. *See Stansell V*, 45 F.4th at 1357; *Stansell II*, 771 F.3d at 724 n.6, 732. Treating state agencies/instrumentalities as subject to TRIA under this definition only when they assist state terrorists would protect nonstate actors that use state facilities to commit acts of terrorism, which "would counteract Congress's purpose in enacting TRIA." *Stansell II*, 771 F.3d at 732. Indeed, as noted above, TRIA's drafters specifically sought to preclude terrorists from hiding behind the sovereign immunity of state agencies/instrumentalities.[17]

[17] The Congress that enacted TRIA was well aware that state entities sometimes support nonstate terrorists. Congress enacted TRIA following the 9/11 attacks, when allegations that Saudi officials had supported the nonstate hijackers were top of mind. *See* Bob Egelko, *9/11 Families Sue Saudis, Sudan for $3 Trillion – Defendants Accused of Funding al Qaeda*, San Francisco Chron. (Aug. 16, 2002), https://perma.cc/QT4J-JGL5. Congress therefore would have expected terror victims sometimes to satisfy judgments against nonstate terrorists by proceeding under TRIA against

Nor does PDVSA find support for its political question argument in *PDVSA US Litigation Trust v. Lukoil Pan Americas LLC*, 65 F.4th 556 (11th Cir. 2023). *See* Br. 40-42. There, this Court held that the determination who is legally authorized to speak for PDVSA *in its status as Venezuela's state oil company* is a political question; that determination would have required the court to decide who speaks for Venezuela. *See* 65 F.4th at 562-63; *see* n.3, *supra*. The question here is fundamentally different: it is whether, as a factual matter, PDVSA is being used to support Maduro's personal acts of terrorism. Resolution of *that* question requires application of TRIA and a factual inquiry into Maduro's practical control over PDVSA, not any determination of Maduro's political legitimacy.

Finally, were there any doubt on this, the Court could find that PDVSA acted as the agency/instrumentality of Maduro prior to January 2019, when the U.S. government had not yet questioned Maduro's status as President of Venezuela. There is ample evidence that PDVSA provided

state agencies/instrumentalities that had provided material support to those terrorists.

material support to Maduro during that time. *See*, *e.g.*, Dkt. 94-5 at 13-22 (describing Maduro's use of PDVSA to launder funds before 2019). And this Court has made clear that conduct at any point can support an agency-or-instrumentality finding. *See Stansell II*, 771 F.3d at 724 n.6 ("is or was ever involved in any aspect" of misconduct); *Stansell V*, 45 F.4th at 1350 (standard "encompassed past involvement or association with a terrorist party"). That determination would support a judgment for the Albán family without any possible political question concern.

### C. Alternatively, The District Court Had Jurisdiction Under The FSIA Commercial-Activities Exception.

In the district court, the Albán family argued that the court alternatively had jurisdiction under the commercial-activities exception to the FSIA. *See* Dkt. 94 at 39-40; Dkt. 344 at 6-8. Although the district court found it unnecessary to address that argument (*see* Dkt. 110 at 4), this Court can affirm on any basis supported by the record, whether or not that ground was considered below. *Waldman*, 871 F.3d at 1289. And here, if the Court does not affirm under TRIA, it can and should affirm by applying the FSIA's commercial-activities exception.

Under that exception, "[a] foreign state [including its instrumentalities] shall not be immune from the jurisdiction of courts of the United States or of the States in any case":

> in which the action is based [1] upon a commercial activity carried on in the United States by the foreign state; *or* [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; *or* [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2) (emphasis added).

A "foreign state" includes "a political subdivision of a foreign state or an agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a); *Turkiye Halk Bankasi A.S.*, 598 U.S. at 272 (foreign state includes "entities that are directly and majority-owned by a foreign state"). "Commercial activity" means "a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). And "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." *Id.*

In determining whether the exception applies, the question is "whether the particular actions that the foreign state performs (whatever

the motive behind them) are the *type* of actions by which a private party engages in trade and traffic or commerce.” *Rep. of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992) (quotation marks omitted); *Devengoechea v. Bolivarian Rep. of Venezuela*, 889 F.3d 1213, 1221 (11th Cir. 2018). Of particular importance here, under this standard it is settled that criminal activities that involve banking or seeking to profit (essential components of money laundering and narco-terrorism) can qualify as commercial activity. *Rodriguez v. Pan Am. Health Org.*, 29 F.4th 706, 716-17 (D.C. Cir. 2022) (financial transactions that supported human trafficking constituted commercial activity); *Adler v. Fed. Rep. of Nigeria*, 219 F.3d 869, 875 (9th Cir. 2000); *Southway v. Cent. Bank of Nigeria*, 198 F.3d 1210, 1217 (10th Cir. 1999); *United States v. Turkiye Halk Bankasi A.S.,* 16 F.4th 336, 350 (2d Cir. 2021) (“participation in money laundering and other fraudulent schemes designed to evade U.S. sanctions” was commercial activity for purposes of FSIA because “those core acts constitute ‘an activity that could be, and in fact regularly is, performed by private-sector businesses’”), *aff’d in part, vacated in part on other grounds, and remanded*, 598 U.S. 264 (2023) (Second Circuit did not need to reach commercial-activity exception to FSIA because FSIA was inapplicable).

Here, PDVSA is subject to FSIA's commercial-activity exception under the first and third prongs of that exception's definition. In this action—a proceeding relating to writs of execution against PDVSA—the relevant commercial activities are PDVSA providing material support to the Maduro regime's narco-terrorism, such as sending illegal drugs to the United States and laundering money.

Under the first prong, the action here is based in part on PDVSA's "commercial activity carried on in the United States." As the district court found, the "murder of Mr. Albán . . . occurred pursuant to a narco-terrorism conspiracy designed to flood Florida with cocaine and to launder the illegal drug money through Florida," and overt acts "occurred in Florida (such as the possession and sale in Florida of cocaine and the laundering of ill-gotten bank accounts in Florida)." Dkt. 56 at 18, adopted at Dkt. 58. PDVSA was central to sending illegal cocaine to and laundering money in the United States. As the complaint alleged, "the Maduro Criminal Enterprise choreographed a billion-dollar international scheme to launder funds embezzled from Venezuelan state-owned oil company PDVSA using Miami, Florida real estate and sophisticated false investment schemes." Dkt. 1 at ¶ 107; *id.* ¶ 101 ("U.S. law enforcement

identified almost a billion dollar[s] in transfers from [PDVSA] to the bank accounts of various Venezuelan contractors in South Florida." (citing affidavit from government special agent)); *see also id.* ¶¶ 5, 22, 24, 65-74, 81, 105 (summarizing indictments and statement from Department of Justice officials regarding Maduro Criminal Enterprise activity falling within U.S. jurisdiction).

Similarly, under the exception's third prong, the underlying suit here is based on "an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere [that] causes a direct effect in the United States." PDVSA's acts outside of the United States that give rise to this action were "in connection" with defendants' broader commercial conspiracy to import drugs into and launder money through the United States, which began elsewhere but had a direct effect in the United States. *See Turkiye Halk Bankasi A.S.*, 16 F.4th at 349 (direct-effect requirement satisfied where Turkish bank laundered illicit Iranian oil proceeds through the U.S. financial system).

Accordingly, FSIA's commercial-activities exception is an independent basis of jurisdiction over PDVSA, separate from TRIA.

## III. PDVSA's Service-of-Process Arguments Lack Merit.

Although PDVSA devotes its principal attention to sovereign immunity, it also maintains that it was not properly served, arguing that *actual* notice of the suit would not satisfy the FSIA's service requirements. Br. 44-54. That assertion is not properly before the Court and, in any event, is wrong.

### A. This Court Lacks Jurisdiction Over The Service-Of-Process Argument.

At the outset, this Court lacks jurisdiction to consider PDVSA's service-of-process claim on interlocutory appeal. PDVSA makes no attempt to demonstrate appellate jurisdiction over this aspect of its appeal, contenting itself with the bald declaration that the Court may consider its challenge to the decision below under "the collateral order doctrine." Br. 6. But courts have recognized that the collateral-order doctrine does *not* apply to the appeal of service-of-process claims.

In particular, "to come within the collateral order doctrine . . . , the order must satisfy each of three conditions: it must (1) 'conclusively determine the disputed question,' (2) 'resolve an important issue completely separate from the merits of the action,' and (3) 'be effectively unreviewable on appeal from a final judgment.'" *Van Cauwenberghe v. Biard*, 486

U.S. 517, 522 (1988); *see Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 431 (1985). Here, the district court's order remanding to the magistrate judge for fact-finding on whether PDVSA had actual knowledge of the litigation satisfies none of these requirements.

The district court's order, as it resolves the service-of-process claim, does *not* (1) "conclusively determine" the disputed service-of-process question because the district court could ultimately determine that PDVSA lacked actual notice of the proceedings, which would resolve the question on factual grounds. Nor does the order (2) "resolve an important issue completely separate from the merits of the action" because the merits look, in part, to whether the Albán family followed the proper procedure against PDVSA (and its subsidiaries) to execute on its judgment. And perhaps most obviously, the service-of-process claim—unlike denial of immunity from suit—(3) *is* "effectively []reviewable on appeal from a final judgment" in the same way that any service-of-process claim is reviewable. That is because PDVSA's service argument is "not that the defendant has a right not to be sued at all, but that the suit against the defendant is not properly before the particular court because it lacks jurisdiction." *Lauro Lines s.r.l. v. Chasser*, 490 U.S. 495, 500 (1989).

*Compare*, *e.g.*, *Nixon v. Fitzgerald*, 457 U.S. 731, 742 (1982) (jurisdiction proper over interlocutory appeal of denial of immunity from suit).

It is, thus, unsurprising that courts of appeals—including this one—routinely hold that they lack jurisdiction over defective service-of-process claims on interlocutory review. *See SEC v. MCC Int'l Corp.*, 2024 WL 180636, at *1 (11th Cir. Jan. 17, 2024) (per curiam) (unpublished) ("The alternate service order is not appealable under the collateral order doctrine because a challenge of the district court's exercise of personal jurisdiction based on service of process can be vindicated following final judgment."); *Tucker v. Faith Bible Chapel Int'l*, 36 F.4th 1021, 1038 (10th Cir. 2022); *United States v. Sinovel Wind Grp. Co.*, 794 F.3d 787, 791 (7th Cir. 2015); *Jefferson v. Delgado Cmty. Coll. Charity Sch. of Nursing*, 602 F. App'x 595, 597 (5th Cir. 2015) (per curiam) (unpublished) (court of appeals lacked jurisdiction to consider service-of-process claim under the collateral order doctrine and noting claim could be raised as part of a final appeal). That understanding is controlling here.[18]

---

[18] PDVSA does not invoke pendant appellate jurisdiction but, if it did, that argument also would fail. Although the Court may "elect" to exercise pendant appellate jurisdiction over a personal jurisdiction issue that is "inextricably intertwined" with a question properly before the Court on

### B. PDVSA's Service-of-Process Argument Is Meritless.

In any event, even if jurisdiction to decide the argument existed, there is nothing to PDVSA's technical complaints (Br. 44-54) that the Albán family's service of process failed to satisfy FSIA Section 1608(b). Addressing that very provision of the FSIA, this Court has squarely held that actual notice is sufficient to make up for any technical deficiency. Notably, PDVSA never so much as mentions this or the many other service-of-process decisions discussed by the court below. Nor does PDVSA explain why the service here did not substantially comply with the FSIA.

**a.** PDVSA hinges its entire service-of-process argument on the notion that its actual notice of the enforcement proceedings is insufficient. Br. 44-54. According to PDVSA, the district court's focus on whether PDVSA had actual notice of the enforcement proceedings against it

---

interlocutory appeal (*see S & Davis Int'l, Inc.*, 218 F.3d at 1297), PDVSA's service-of-process claim is not inextricably intertwined with its FSIA immunity claim. The service-of-process claim focuses on *how* the FSIA *procedural* elements apply, while the TRIA/FSIA question asks *whether* the FSIA's *substantive* subject-matter jurisdiction requirements apply. Those quite different claims do not rely on the same evidence or legal authorities and resolution of one has no bearing on the resolution of the other. *Compare id.* at 1297, 1304 (minimum contacts and direct effects of commercial-activity exception to FSIA were inextricably intertwined because direct effects were evidence of minimum contacts).

"adopt[ed] a novel rule" and "did not explain its decision." Br. 52. That is wrong. As the court below noted, its conclusion that PDVSA's actual notice would be sufficient follows from a long line of decisions—including "binding precedent" from this Court—recognizing that "actual notice should override technical deficiencies in service under [28 U.S.C. § 1608(b)]." Dkt. 401 at 10-12 (quotations omitted) (collecting cases, including *Harris Corp. v. Nat'l Iranian Radio & Tele.*, 691 F.2d 1344 (11th Cir. 1982)).

Indeed, this Court has already rejected the precise argument PDVSA advances here. In *Harris*, the Court held that service on a foreign agency or instrumentality was valid even though it did not precisely comport with Section 1608(b). 691 F.3d at 1353. What ultimately matters for adequate service under that provision, the Court said, is whether the party received actual notice, not alleged "deficiencies in [the] methods of service" premised "on the technical requirements of § 1608." *Id.* at 1352. The Court was unequivocal: the defendant "does not deny that it had notice of this action. The attacks made . . . go only to asserted noncompliance with certain FSIA requirements that exist merely to assure that actual notice be received. . . . The failure to follow precisely those steps in

§ 1608 designed to ensure that actual service be made should not override and invalidate the fact that in this case actual notice was received." *Id.*

And that makes sense. Even PDVSA's own discussion of the various ways to serve under Section 1608(b) (*see* Br. 46-48) concludes with whether the form of service on a foreign agency or instrumentality is "reasonably calculated to give actual notice." *Id.* at 48. That is the entire point of Section 1608(b) of the FSIA: through it, "Congress wished to [e]nsure that the sovereign owner would receive actual notice." *Velidor v. L/P/G Benghazi*, 653 F.2d 812, 821 (3d Cir. 1981) (discussing H.R. Conf. Rep. No. 94-1487 (1976), at 23-24). And as the district court noted, focusing on actual notice to gauge sufficiency of service under Section 1608(b) is hardly "novel." Br. 52. *See* Dkt. 401 at 10-12. Courts across the country have agreed with *Harris*. *See, e.g.*, *Magness v. Russian Fed'n*, 247 F.3d 609, 616-17 (5th Cir. 2001) ("Our holding as to section 1608(b) is in accord with the Third, Sixth, Ninth, Eleventh, and D.C. Circuits, all of which have determined that substantial compliance with section 1608(b) is sufficient so long as the defendants have actual notice of the suit.") (discussing *Harris* and collecting authorities).

PDVSA's contrary argument rests on inapposite decisions. Br. 45, 52-54. PDVSA repeatedly points to *Republic of Sudan v. Harrison*, 587 U.S. 1 (2019). *See* Br. 13, 45, 46, 48, 49, 53. But *Sudan* has nothing to do with the issue here. That case concerns an entirely different statutory provision—FSIA Section 1608(a)(3), which deals only with "foreign states" (not state agencies or instrumentalities) and provides that a "foreign state may be served by means of a mailing that is 'addressed and dispatched . . . to the head of the ministry of foreign affairs of the foreign state concerned.'" *Sudan*, 587 U.S. at 4 (quoting 28 U.S.C. § 1608(a)(3)). Unsurprisingly, the Court held that this plain language required compliance with those specific requirements when serving a foreign state.

Indeed, to reach its holding about Section 1608(a)(3), the *Sudan* Court expressly *distinguished* the very service provision at issue here—Section 1608(b)(2), which concerns service on "an agency or instrumentality of a foreign state." 587 U.S. at 11 (quoting 28 U.S.C. § 1608(b)(2)). The Court observed that, unlike Section 1608(a)(3), "Section 1608(b)(2) provides for delivery of a service packet to an officer or a managing or general agent of the agency or instrumentality of a foreign state or 'to any other agent authorized by appointment or by law to receive service

of process in the United States.'" *Sudan*, 587 U.S. at 13. The Court also noted that "§ 1608(b)(3)(B), unlike § 1608(a)(3), contains prefatory language saying that service . . . is permissible 'if reasonably calculated to give actual notice.'" *Id.* at 11-12. Congress's inclusion of this sort of flexible language in Section 1608(b)(2)—but not in Section 1608(a)(3)—is one of the principal reasons why the Court read the *latter* provision's requirements as *in*flexible. *Id.* at 11-13.

PDVSA's other authority is even further afield. *Prewitt Enterprises, Inc. v. OPEC* (cited at Br. 45, 52) simply does not deal with service under the FSIA. 353 F.3d 916 (11th Cir. 2003). The *Prewitt* court concluded that "[i]t is clear that OPEC is not a foreign state or political subdivision of a foreign state pursuant to § 1608 of the FSIA." *Id.* at 922 n.9. As a result, the Court assessed the adequacy of service only under Federal Rule of Civil Procedure 4(f). *See id.* at 923-24. And even in that context, the Court did not discount the significance of actual notice to the adequacy of service. *Contra* Br. 45, 52. Just the opposite: the Court noted that "receipt of actual notice is an important factor in considering whether service of process is adequate." *Prewitt*, 353 F.3d at 924 n.14.

**b.** PDVSA's service-of-process complaint rests on another false premise. It is untrue that the Albán family made only a "perfunctory attempt at service," one that "was woefully insufficient to satisfy the FSIA's service requirements." Br. 49. The Albáns followed the strictures of Section 1608(b) and, as the court below correctly concluded, demonstrated "substantial compliance" with that provision. Dkt. 401 at 9.[19]

Under the relevant FSIA provision, "if no special arrangement for service exists"—and PDVSA concedes that there is none here, *see* Br. 47—service may be made "by delivery of a copy of the summons and complaint either to an officer, a managing or general agent, or to *any other agent authorized* by appointment or *by law* to receive service of process in the

[19] PDVSA is wrong in asserting that "the District Court correctly determined that the [Albáns] had failed to comply with the FSIA's service provisions." Br. 44; *accord id.* at 48. The district court never made such a determination. And the magistrate judge only equivocally noted, in a footnote, that he "do[es] not reject PDVSA's argument that Plaintiffs' method of service (via the Florida Secretary of State) *may* lack footing under the FSIA." Dkt. 401 at 12 n.3 (emphasis added). The magistrate judge never held that PDVSA was correct. *See, e.g.*, *id.* at 11 ("Accordingly, with no persuasive reason (or authority) to depart from Eleventh Circuit precedent, we find that, even if Plaintiffs' service attempt contained deficiencies under the FSIA, those deficiencies 'should not override and invalidate the fact that in this case notice was actually received.'") (quoting *Harris*, 691 F.2d at 1352).

United States; or in accordance with an applicable international convention on service of judicial documents." 28 U.S.C. § 1608(b)(2) (emphasis added). The Albán family did exactly that. It served an agent of PDVSA authorized by law to receive service (Fla. Stat. § 48.181)—the Florida Secretary of State. *See* Dkt. 105 at 1-2 (confirming service in compliance with laws incorporated under Rule 4); *see also* Fed. R. Civ. P. 4(j)(1) (incorporating by reference FSIA § 1608).

Courts routinely recognize that when federal law permits service on an "agent authorized by law," plaintiffs may effectuate service on a state Secretary of State. *See, e.g.*, *Clarendon Am. Ins. Co. v. Krishna Assocs. of Titusville, Inc.*, 2006 WL 3762076, at *1 (M.D. Fla. Dec. 20, 2006) (holding that, because Rule 4(h) authorized service on "agent authorized by . . . law," substitute service on the Florida Secretary of State was appropriate).[20] And the understanding that the phrase "agent authorized by law" includes state Secretaries of State was commonplace long before

[20] *See, e.g.*, *Casares v. Altman Specialty Plants, LLC*, 2023 WL 6162328, at *2 (D.N.M. Sep. 21, 2023) ("service was made upon an agent authorized by law to receive service of process: the Secretary of State"); *Miller v. Collectron Corp.*, 1999 WL 730981, at *7 n.11 (E.D.N.Y. Sep. 16, 1999) (same); *SEC v. Am. Land Co.*, 1987 WL 19930, at *4 (D.D.C. Nov. 6, 1987) (same).

Congress included that term in the FSIA, which was enacted in 1976. *E.g.*, *Atl. Enters., Inc. v. Nat'l Equip. Rental, Ltd.*, 208 F. Supp. 710, 711 (D.P.R. 1962); *Magelssen v. Hale*, 81 F. Supp. 138, 139 (W.D. Mo. 1948); *Clancy v. Balacier*, 27 F. Supp. 867, 869 (S.D.N.Y. 1939). Congress is thus presumed to have incorporated those background principles into the FSIA. *See Lamar, Archer & Cofrin LLP v. Appling*, 584 U.S. 709, 721-22 (2018).

Florida's statute on "substituted service on non-residents and foreign businesses engaging in business in [the] state" provides that:

> the acceptance . . . by any foreign business entity of the privilege extended by law to nonresidents to operate, conduct, engage in, or carry on a business or business venture in this state, or to have an office or agency in this state, is deemed to constitute an appointment by the individual or foreign business entity of the Secretary of State of this state as its agent on whom process in any action or proceeding against the individual or foreign business entity.

Fla. Stat. § 48.181(2). By doing business in Florida, PDVSA accepted the State's Secretary of State as an "agent authorized . . . by law" to accept service on its behalf. 28 U.S.C. § 1608(b)(2).

PDVSA does not (because it cannot) deny that it has long done business in Florida. Among other things, as the district court recognized, "PDVSA sent money from its accounts to various contractors in South

Florida to perpetuate a money laundering and bribery scheme." Dkt. 401 at 13 (finding PDVSA's earlier attempt to paint itself as just an "ostensibly innocent actor carrying out Maduro's maleficent orders" was not "factually credible"); *see also, e.g.*, Dkt. 94 at 10-11 (describing indictment of PDVSA executives in Florida); Dkt. 94-5 (describing PDVSA's conduct throughout the United States, including Florida). For years, and in a variety of ways, PDVSA "purposefully availed" itself of the opportunity to operate in Florida. *Id.* at 13-14 (quoting *Del Valle v. Trivago GMBH*, 56 F. 4th 1265, 1277 (11th Cir. 2022)); *see Del Valle*, 56 F. 4th at 1276 (counseling courts to look to "*all contacts* between the nonresident defendant and the forum state" to assess personal jurisdiction (emphasis added)). That makes the Florida Secretary of State (Fla. Stat. § 48.181) an "agent authorized . . . by law to receive service of process in the United States." 28 U.S.C. § 1608(b)(2).

Nor does PDVSA make clear what other service under Section 1608(b) it wanted, much less how that service would have been calculated to provide it with additional actual notice. What it does say is internally inconsistent. For instance, PDVSA points to the supposed need to serve the current Venezuelan regime under the Hague Convention (Br. 47-48,

51), only to elsewhere say that its "Venezuelan facilities have been illegally usurped by representatives of the illegitimate Maduro regime." *Id.* at 51. By its own telling, then, the additional service it demands would have been an exercise in futility. Indeed, the district court here authorized alternative forms of service precisely because the Maduro regime refuses to accept U.S. service of process. Dkt. 60. PDVSA has no right to insist on pointless service formalities with the hope of falling between the cracks. *Cf., e.g.*, *Corrado v. N.Y. Unified Ct. Sys.*, 163 F. Supp. 3d 1, 16 (E.D.N.Y. 2016) (A party "cannot evade service . . . and then complain that he was prejudiced by not receiving service"), *aff'd,* 698 F. App'x 36 (2d Cir. 2017).

* * *

## CONCLUSION

The district court's judgment should be affirmed.

Dated: December 8, 2025

Respectfully submitted,

/s/*Charles A. Rothfeld*

Charles A. Rothfeld
Alex C. Lakatos
Natasha K. Harnwell-Davis
MAYER BROWN LLP
1999 K Street, N.W.
Washington, D.C. 20006
CRothfeld@mayerbrown.com
(202) 263-3000

Jaime D. Guttman
Scale Law Partners, LLC
777 Brickell Avenue, Ste. 500
Miami, FL 33131
jaime@scale.law
(786) 273-9033

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7) because it contains 12,974 words, excluding the parts of the brief exempted by Rule 32(f).

This brief complies with the typeface and style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared using Microsoft Word for Microsoft 365 and is set in Century Schoolbook font in a size equivalent to 14 points or larger.

Dated: December 8, 2025

/s/ *Charles A. Rothfeld*
Charles A. Rothfeld

## CERTIFICATE OF SERVICE

I certify that on December 8, 2025, I filed the foregoing via the CM/ECF system and the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

Dated: December 8, 2025

/s/ *Charles A. Rothfeld*
Charles A. Rothfeld